# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAUL ZUKERBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA | ) | Civil Action No. 13-cv-1557 (JEB) |
| BOARD OF ELECTIONS AND ETHICS, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COUNCIL OF THE DISTRICT OF COLUMBIA | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Paul Zukerberg has sued the District of Columbia Board of Elections and Ethics ("BOE") and the Council of the District of Columbia ("Council") claiming, in various ways, that the passage of Bill 20-134, the "Elected Attorney General Implementation and Legal Service Establishment Amendment Act of 2013" ("2013 Act"), violates his right to vote for an elected Attorney General during calendar year 2014. *See* Compl. [Dkt. No. 1-1].  On October 16, 2013, Plaintiff filed a Motion for a Preliminary Injunction resting upon that same legal theory and seeking, in substance, an order prohibiting Defendants from enforcing the 2013 Act pending adjudication on the merits of his claims.  *See* Mot. Prelim. Inj. [Dkt. No. 3] at 1.  Pursuant to Local Civil Rule 65.1(c) and this Court's Minute Order of October 17, 2013, Defendants, by and through undersigned counsel, hereby oppose Plaintiff's request.

As explained in greater detail herein, Plaintiff's Motion must be denied because:  (1) Plaintiff's claim is not ripe for adjudication as the 2013 Act has not yet become law; (2) Plaintiff

lacks standing, raising only a generalized grievance; (3) his contention that he has been denied the right to vote fails on the merits in multiple ways; and (4) an analysis of the lack of harm to Plaintiff weighed against the harm to the Defendants from granting injunctive relief compels denial of his Motion.   In short, Plaintiff's Motion fails in countless respects to justify the extraordinary remedy he seeks, and his request must therefore be rejected.

## BACKGROUND

On February 2, 2010, the Council adopted the "Attorney General for the District of Columbia Clarification and Elected Term Amendment Act of 2009," D.C. Law 18-160 ("2010 Act"), which proposed a series of institutional modifications to the position of Attorney General for the District of Columbia.   Among other things, the 2010 Act clarified the duties and responsibilities of the Attorney General and established appointment requirements and minimum qualifications for the position.   *See* D.C. Law 18-160, D.C. Code § 1-301.81, *et seq.* Additionally, as relevant here, Section 201 of the 2010 Act proposed an amendment to the District of Columbia Charter to establish the Attorney General as an elected office.   In pertinent part, Section 201 provided:

(a) The Attorney General for the District of Columbia shall be elected on a partisan basis by the registered qualified electors of the District.

* * * *

(c) The term of office for the Attorney General shall be 4 years and shall begin on noon on January 2nd of the year following his or her election.   The term of office of the Attorney General shall coincide with the term of office of the Mayor.

* * * *

(e) The first election for the position of Attorney General shall be after January 1, 2014.

D.C. Law 18-160 § 201(b), D.C. Code § 1-204.35.   Upon ratification by the electorate on November 2, 2010, and following a mandatory period of congressional review, Section 201 amended the Charter, , effective May 28, 2011.[1]

The 2010 Act also amended portions of the "District of Columbia Elections Code of 1955," D.C. Code § 1-1001.01, *et seq.* ("Elections Code"), to provide for the election of the Attorney General.   *See* D.C. Law 18-160 § 131.   However, it did not establish campaign regulations to govern the election.   *Id.*   Partly, to that end, the 2013 Act was passed by the Council on October 1, 2013.

The 2013 Act implemented a series of conforming amendments to the Elections Code that provided for the Attorney General to become an elected position pursuant to the campaign procedures applicable to other city-wide elections.   *See* July 3, 2013 Report on Bill 20-134, attached as **Exhibit A**, at 10.   As relevant to Plaintiff's Complaint, the 2013 Act further provided for the amendment of Section 102(a) of the 2010 Act to require:

> (a) Until such time as an Attorney General is elected under [D.C. Code] § 1-204.35, which time will not be before January 1, 2018, the Attorney General for the District of Columbia shall be appointed by the Mayor with the advice and consent of the Council pursuant to [D.C. Code] § 1-523.01.

*See* B20-134, attached as **Exhibit B**, at 15.   In current form (i.e. without the amendment), Section 102(a) states:

> (a) Until such time as an Attorney General is elected under [D.C. Code] § 1-204.35, the Attorney General for the District of Columbia shall be appointed by the Mayor with the advice and consent of the Council pursuant to [D.C. Code] § 1-523.01.

D.C. Law 18-160 § 102(a), D.C. Code § 1-301.82.[2]   Therefore, should the 2013 Act become effective, it will have the practical effect of postponing the first election for Attorney General in

---

[1] The remainder of the 2010 Act, which did not amend the Charter, became effective as ordinary legislation on May 27, 2010.

the District until at least the 2018 election cycle.  *See* D.C. Code § 1-204.35 ("term of office of the Attorney General shall coincide with the term of office of the Mayor").

As of the date hereof, the 2013 Act is not effective legislation.  In the District of Columbia, ordinary (i.e. non-emergency) legislation becomes effective following passage by the Council and approval by the Mayor, only after a 30-day congressional review period.  *See* D.C. Code § 1-206.02(c)(1).  The 2013 Act was approved by the Mayor without signature on October 22, 2013, and transmitted to Congress as Act 20-207 on October 24, 2013.  *See* Legislative Information Management System ("LIMS") printout concerning the 2013 Act, attached as **Exhibit C**.  Accordingly, the 2013 Act will become effective no earlier than December 20, 2013. *Id.* ("Projected D.C. Law Date").[3]

Plaintiff's Complaint, filed on September 30, 2013, seeks to require Defendants to hold an election for Attorney General of the District of Columbia during the 2014 election cycle.  *See* Compl., [Dkt. No. 1-1], Relief Requested.  According to the Complaint, because the 2010 Act provides that "the first election for the position of Attorney General shall be after January 1, 2014," it creates a "right to vote" for that office no later than year's end 2014.  *Id.* at ¶ 17.  That "right," Plaintiff claims, was infringed by the delay of the election as proposed by the 2013 Act, giving rise to causes of action under the First, Fifth and Fourteenth Amendments to the United States Constitution (Counts I and II), as well as D.C. Code § 1-204.35, the Charter provision providing for an elected Attorney General (Count III).  *See id.* at ¶¶ 15 - 28.  Plaintiff's Motion

---

[2] The 2013 Act also proposed significant structural changes to the Office of the Attorney General and the Executive Office of the Mayor, including the creation of a Mayor's Office of Legal Counsel to operate independent of the Attorney General, and the transfer of authority over agency counsel from the Attorney General to their respective client agencies. Exhibit B at 2.

[3] While LIMS shows a "Projected DC Law Date" of December 20, 2013, this assumes both that no action is taken against the bill by Congress, and that Congress does not go on recess for more than three days before that date.  Exhibit C; D.C. Code § 1-206.02(c)(1).

for Preliminary Injunction, filed on October 16, 2013, rests upon that very legal theory and seeks to prohibit Defendants from enforcing the 2013 Act pending adjudication on the merits of his claims. *See* Mot. Prelim. Inj. [Dkt. No. 3] at 1.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. As demonstrated here, Plaintiff's Motion for Preliminary Injunction fails to satisfy each of the foregoing factors and therefore must be denied.

## I.  PLAINTIFF CANNOT SUCCEED ON THE MERITS OF HIS CLAIMS

Plaintiff's Motion for Preliminary Injunction must be denied because it is extremely unlikely that he will succeed on the merits of his claims. Unequivocal precedent of this Circuit establishes that a plaintiff's "likelihood of success [on the merits] is an independent, free-standing requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quotations omitted); any failure to make a "clear showing" of probable success is thus independently sufficient to defeat a motion for preliminary injunction, *see Ark. Dairy Coop. Ass'n v. United States Dep't of Agric.*, 573 F.3d 815 (D.C. Cir. 2009) (refusing to consider other factors where plaintiff had not shown likelihood of success). Plaintiff here cannot succeed on the merits of his claim because, as a threshold matter, he has not presented the Court with a justiciable case or controversy: Plaintiff's challenge to the 2013 Act is not ripe for review, and even it were, Plaintiff would still lack standing to assert it. In other words, Plaintiff cannot

possibly succeed on the claims underlying his Complaint because the Court does not have authority to adjudicate them.

But even if that were not the case, the legal position set forth in Plaintiff's Motion for Preliminary Injunction cannot possibly succeed. As noted above, whether styled as a claim arising under the District of Columbia Charter (Count III) or the First and Fifth Amendments to the Constitution, the gravamen of Plaintiff's Complaint is that the 2010 Act establishes a "right to vote" for Attorney General of the District of Columbia during the 2014 election cycle. *See* Compl., [Dkt. No. 1-1], ¶ 17. That proposition not only misconstrues critical facts, but also depends upon a tortured reading of the 2010 Act that ignores basic principles of statutory interpretation; its success, therefore, depends upon the Court accepting an argument that is plainly unmeritorious. Because Plaintiff has no reasonable likelihood of ultimate success on any of his claims (even assuming they are properly before the Court), his Motion for Preliminary Injunction must be denied without more.

## A.  Plaintiff Has Not Presented A Justiciable Case Or Controversy

The "most fundamental" limit to federal-court authority is supplied by Article III of the Constitution, and provides that the federal judicial power reaches only "Cases" and "Controversies." U.S. Const. Art. III, Sec. 2; *see Clapper v. Amnesty Int'l*, 568 U.S. __, 2013 WL 673253 at *7 (Feb. 26, 2013) ("[n]o principle is more fundamental").[4] One important

---

[4] As the Supreme Court has explained, "Article III jurisdiction is always an antecedent question" and a court may not therefore "resolve contested questions of law when its jurisdiction is in doubt." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (U.S. 1998); *accord Scenic Am., Inc. v. United States DOT*, 2013 U.S. Dist. LEXIS 151778, *8-9 (D.D.C. Oct. 23, 2013) (Boasberg, J.) ("[a] court has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"). Thus, in considering whether to grant preliminary injunctive relief, members of this Court recognize that "[t]he first component of the likelihood of success on the merits prong" involves issues of Article III jurisdiction. *Barton v. District of*

element of the case-or-controversy requirement provides that courts must avoid "premature adjudication," exercising jurisdiction only upon a showing that a claim is "ripe for review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  A second, related component requires that a plaintiff establish that he has standing to pursue the claims in his complaint.  *Clapper, supra.* Plaintiff here cannot satisfy either prerequisite, and he therefore cannot possibly demonstrate a likelihood of success on the merits, warranting denial of his Motion for Preliminary Injunction.[5]

### 1.  *Plaintiff's Challenge To The 2013 Act  Is Not Ripe For Review*

In order to determine whether a claim is ripe for review, courts ordinarily "'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 978 (1999) (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).  As the Circuit has explained, "the fitness analysis requires the court to consider both whether the context in which the issue is presented is sufficiently concrete and conducive to judicial determination, and whether deciding the issue now would violate principles of judicial restraint and efficiency that counsel against spending scarce resources on what amounts to shadow boxing."  *Alcoa Power Generating, Inc. v. FERC*, 643 F.3d 963, 967 (D.C. Cir. 2011) (internal quotations omitted).   As explained below, the issues raised in Plaintiff's Complaint, all of which turn on the fate of the 2013 Act, lack the immediacy and reality necessary to establish "fitness" for judicial resolution.

Practically speaking, Plaintiff's challenge to the 2013 Act is not "fit" for decision because it presupposes a future event that may never actually occur, *i.e.*, that the 2013 Act will become

---

*Columbia*, 131 F. Supp. 2d 236, 243 (D.D.C. 2001) (citing *Steel Co., supra*) ("first component . . . usually examines whether the plaintiffs have standing in a given case").

[5] Defendants intend to move to dismiss the Complaint on these and other grounds pursuant to the schedule set by the Court.  *See* Minute Or. (Oct. 17, 2013) (ordering Defendants to file responsive pleadings by November 14, 2013).

effective law.  As explained elsewhere in this brief, the 2013 Act was approved by the Mayor on

October 22, 2013, transmitted to Congress for review on October 24, 2013, and is now subject to

a period of congressional review prior to becoming enforceable in the District.  *See* discussion

*supra* at 4.  During the review period, Congress may disapprove of the 2013 Act, in whole or in

part, by joint resolution enacted by both houses and signed by the President.  D.C. Code §§ 1-

204.04(e), 1-206.06(c)(1).  Thus, at present, the future application of the 2013 Act is uncertain; it

is not now and may never be effective law, and it axiomatic that "[a] claim is not ripe for

adjudication if it rests upon contingent future events that . . . may not occur."  *Texas*, 523 U.S. at

300; *accord See Alcoa Power*, 643 F.3d at 967 (D.C. Cir. 2011) (noting "usually unspoken

underlying rationale . . . that a claim may be unripe where if we do not decide the claim now, we

may never need to").  In light of the foregoing, Plaintiff's challenge to the 2013 Act is unripe

because the future effect of the Act may never occur as he anticipates.  Likewise, a judicial

decision under such circumstances would be purely advisory in nature and thus inappropriate for

this Court to render.  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (U.S. 1937) (reiterating

prudential prohibition against "opinion[s] advising what the law would be upon a hypothetical

state of facts").

While it is true that there are occasions in which courts permit pre-enforcement

challenges to statutes and regulations, the rationale commonly employed in such cases does not

apply here.  In *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), the seminal Supreme Court

decision in this regard, the petitioners prescription drug manufacturers sought judicial review of

a federal regulation requiring specific changes to existing labeling requirements.  *Id.* at 138-139.

The regulation at issue had taken effect but had yet to be enforced by the respondent federal

agency.  *Id.* at 139.  Notwithstanding that fact, the Court determined that the petitioners'

challenge was ripe for review, relying principally on the fact that the existence of the regulation without more placed the petitioners in the untenable position of choosing between complying (and incurring economic hardship) or refusing to comply at the risk of future enforcement. *Id.* at 152. The hardship on the petitioners was present and real: In the Court's words, "the impact of the regulations upon the petitioners [was] sufficiently direct and immediate as to render the issue appropriate for judicial review [prior to the regulations being enforced]."

Plaintiff here faces no such predicament; in fact, the purported issues surrounding the validity of the 2013 Act do not impose any present hardship on Plaintiff whatsoever. In evaluating hardship in this context, courts generally consider "whether *postponing* judicial review would impose an undue burden on [the party seeking relief]." *Harris v. FAA*, 353 F.3d 1006, 1012 (D.C. Cir. 2004) (emphasis in original). As a practical matter, Plaintiff's alleged injury to his "right to vote" for Attorney General will manifest, if at all, no less than six months in the future. *See* Mot. Prelim. Inj., [Dkt. No. 3], at 4 (noting that the primary election for the office will not be until April 1, 2014).[6] During that time, BOEE is required by law to enforce the 2010 Act unless it is superseded by other effective legislation. *See* D.C. Code § 1-1001.06. As such, any present threat to Plaintiff's "right to vote" lacks dimensions of both immediacy and directness: He will not himself suffer any meaningful hardship during the coming months if his challenge to the 2013 Act is postponed, and his concern for a general "chilling effect" on the election process is far too speculative to warrant serious consideration. *Center for Law & Ed. v. Dep't of Ed.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) ("[u]nadorned speculation [does] not suffice to invoke the judicial power"); *Clark v. Library of Congress*, 750 F.2d 89, 94 n.5 (D.C. Cir. 1984) ("potential injury is too speculative . . . [i]njunctions will not issue to prevent injuries

---

[6] This of course presupposes that Plaintiff is indeed a registered member of a political party, a fact that he does not actually establish in his Motion for Preliminary Injunction. To the extent he is not, his "right to vote" for Attorney General cannot actually manifest for at least a year.

neither extant nor presently threatened, but merely feared"). Conversely, prudential concerns weigh heavily against the Court meddling prematurely in the business of coordinate branches of government. *See Clapper*, 2013 WL 673253 at *7 (justicability doctrine "built on separation-of-powers principles [and thus] serves to prevent the judicial process from being used to usurp the powers of the political branches").

Coupled with the potential waste of judicial resources inherent in entertaining a hypothetical claim, Plaintiff's lack of any direct and immediate harm signals that his challenge to the 2013 Act is not ripe for adjudication. Because Plaintiff has not alleged a ripe claim, he has no reasonable likelihood of succeeding in this action and his Motion for Preliminary Injunction must be denied.

### 2. *Plaintiff Lacks Standing To Challenge The 2013 Act*

In order to establish standing, the party invoking federal jurisdiction bears the burden of demonstrating three "irreducible constitutional minimum" requirements:

> *First*, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Second*, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (emphasis added). These basic requirements—injury-in-fact, causation, and redressability—must be proven separately as to each request for relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 185 (U.S. 2000) ("a plaintiff must demonstrate standing separately for each form of relief sought"); *see also Lewis v. Casey*, 518 U.S. 343, 358 (U.S. 1996) ("standing is not dispensed in gross").

Plaintiff fails miserably to satisfy the "constitutional minimum," *Lujan, supra*, primarily because the alleged injury underlying his Complaint is shared by the public at large.

The Supreme Court has "'consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[has not suffered a cognizable injury and] does not state an Article III case or controversy.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (citing *Lujan*, 504 U.S. 573-74).  In *Lance*, a right-to-vote case, four Colorado voters sued the Colorado Secretary of State alleging that a court-ordered redistricting plan violated the Elections Clause, U.S. Const. Art. I, Sec. 4., because it authorized congressional districts drawn by a state court rather than the state legislature.  549 U.S. at 437-38.  The Supreme Court unanimously held that the plaintiffs had suffered no injury for standing purposes, notwithstanding the fact that the plaintiffs were citizens and registered voters in the counties subject to the allegedly unconstitutional re-districting.  *Id.* at 441-42.  According to the Court, the reason why the plaintiffs lacked Article III standing was "obvious"—

> The only injury plaintiffs allege[d was] that the law—specifically the Elections Clause—ha[d] not been followed.  This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Court had] refused to countenance in the past."

*Id.* at 442.  In reaching that conclusion, the Court explained that the voters' claims were "quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where [the Court *had*] found standing," such as racial or gender-based classifications in voting systems or vote dilution of a discernable class of persons.  *See id.* (distinguishing *Baker*, 369 U.S. at 207-08, where plaintiffs alleged vote dilution in certain congressional districts vis-à-vis others similarly

situated); *see also Thornburg v. Gingles*, 478 U.S. 30 (1986) (racially-motivated vote dilution); *Leser v. Garnett*, 258 U.S. 130 (1922) (gender-based vote dilution).[7]

Unlike the plaintiffs in the voting rights cases distinguished in *Lance* who alleged concrete, *personalized* injuries, Plaintiff here, like the plaintiffs in *Lance*, has alleged only that the law, specifically the 2010 Act, has not been followed.  *See* 549 U.S. at 442.  The crux of Plaintiff's alleged injury is that the 2013 Act "deprived the voters of their rights," and in turn deprived him of his rights, because he "has voted in District of Columbia elections in the past, and desires and intends to vote in the forthcoming 2014 primary and general elections."  *See* Compl., [Dkt. No. 1-1], at ¶¶ 10-11; *see also id.* at ¶ 1("[t]his is an action to secure the rights of

---

[7] Other federal courts have relied on *Lance* to deny standing to plaintiffs attempting to enforce generalized interests in the election process that are common to all other voters.  *See e.g.*, *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1331-33 (11th Cir. 2007) (abrogating prior precedent finding standing for voters *qua* voters; holding voters lacked standing to challenge a consent decree increasing the number of representatives and requiring a cumulative voting system because plaintiffs had failed to assert "concrete and personalized injuries," but rather sought "to protect an asserted interest in being free of an allegedly illegal electoral system"); *Nolles v. State Comm. for the Reorganization of Sch. Dists*, 524 F.3d 892, 899-900 (8th Cir. 2008) (plaintiffs seeking to challenge application of the Nebraska Constitution to a legislatively-created referendum process, asserting only "an injury to the right of every voter to a fundamentally fair election," lacked standing on the reasoning set forth in *Lance*); *Johnson v. Bredesen*, 356 Fed. Appx. 781, 784 (6th Cir. 2009) (voters lacked standing to challenge state law providing for appointment rather than election of judges on the grounds that the law deprived them of the right to vote; plaintiffs only alleged that "the Fourteenth Amendment [was] not being followed" which was not a "particularized stake in the litigation" as required by *Lance*); *Page v. Tri-City Healthcare Dist.*, 860 F. Supp. 2d 1154, 1163 (S.D. Cal. 2012) (citing *Lance* for the proposition that, "[a]s the body of voter standing jurisprudence indicates, Plaintiff must show how his averred injury is peculiar to himself, distinguished from an injury shared equally with his fellow citizens"); *but see League of United Latin Am. Citizens v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011) (distinguishing *Lance*, holding that "complete deprivation of [ ] right to vote" confers standing even if shared by the entire electorate).  The Supreme Court's decision in *United States v. Hays*, 515 U.S. 737 (1995), can also be read for the proposition that the general interest in being free from an unlawful election law is not a sufficiently individualized interest to confer standing.  In *Hays*, the Court refused to hear an equal protection challenge to a state redistricting plan on the grounds that the plaintiffs, while registered voters in the state thereby impacted by the apportionment scheme, were not actually residents of the district in which the alleged gerrymandering had occurred.  *See id.* at 745-46.

District of Columbia voters to elect their Attorney General").  He does not contend that any provision of the 2013 Act injures him in any way that is unique to him or even to some broader, yet still discernable, class of persons.  As the Court explained in *Lance*, Plaintiff's interest in being free from an allegedly illegal election law "is precisely the kind of undifferentiated, generalized grievance about the conduct of government" that is better suited for resolution in the representative branches.  549 U.S. at 442.  Plaintiff thus has no standing to bring his claims and no reasonable likelihood of succeeding in this action.  His Motion for Preliminary Injunction must be denied.

**B. Even If Plaintiff's Claims Are Justiciable, He Cannot Succeed On The Merits Because His Complaint Rests On The Mistaken Assumption That The 2010 Act Creates A Right To Vote For Attorney General In 2014**

As noted elsewhere in this brief, Plaintiff's three-count Complaint essentially alleges a single legal theory, the gravamen of which is that the 2013 Act, should it become effective law, will violate Plaintiff's "right to vote" as established by the 2010 Act.  *See* discussion *supra* at 2-5.  A right to vote created by state law is of course subject to federal court protections.  *See Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("all qualified voters have a constitutionally protected right to vote . . . in state as well as in federal elections").  And it is indeed true that ordinary legislation cannot contravene the District of Columbia Charter.  *See Price*, 645 A.2d at 599.[8]  However, as explained below, Plaintiff's legal theory fails *ab initio* because the 2010 Act does not actually create the right Plaintiff seeks to enforce through his lawsuit, *i.e.*, to vote for Attorney General during the 2014 election cycle.  In other words, according to basic principles of statutory interpretation, the 2013 Act does not conflict in any way with the portion of the 2010

---

[8] However, it should also be noted that Charter Amendments are not self-executing.  *Convention Center Referendum Committee, et al., v. Board of Elections and Ethics, et al.*, 399 A.2d 550, 552-553 (1979).  As a result, further action by the Council, including, in this case, the 2013 Act, is often necessary to fully realize a Charter Amendment.

Act that established the Attorney General as an elected position.  As such, Plaintiff's position is unmeritorious and his Motion for Preliminary Injunction must be denied.  *See Sherley*, 644 F.3d at 393 (success on merits is independent requirement for issuance of preliminary injunction).

    **1.** ***Plaintiff's Claim That The 2013 Act Is Inconsistent With The 2010 Act Does Not Withstand Even The Most Superficial Scrutiny***

The portion of the 2010 Act that Plaintiff claims was "overturn[ed]" provides that "[t]he first election for the position of Attorney General shall be after January 1, 2014."  *See Compl.*, [Dkt. No. 1-1] at 2; *and also* D.C. Code Ann. § 1-204.35(e).  This portion of the 2010 Act was proposed as a Charter Amendment that was ratified by the voters in 2010.  The 2013 Act—the putative law that Plaintiff claims "overturn[s]" the portions of the Charter Amendment proposed by the 2010 Act—provides that "[u]ntil such time as an Attorney General is elected under [D.C. Code] § 1-204.35, which time shall not be before January 1, 2018, the Attorney General for the District of Columbia shall be appointed by the Mayor with the advice of the Council pursuant to [D.C. Code] § 1-523.01."  *See* Exhibit B.[9]  On its face, none of the language in the 2013 Act is inconsistent with the cited provision of the 2010 Act.  *See Price v. District of Columbia Board of Elections and Ethics*, 645 A.2d 594, 599 (D.C. 1994) (only invalidating those portions of legislation *that were inconsistent* with a charter amendment).  All possible election dates that are "not… before January 1, 2018" are also "after January 1, 2014."  There is no inconsistency.  Plaintiff's claim does not withstand even the most superficial scrutiny.

    **2.** ***Even Read In Context, Nothing In The 2010 Act Requires The Election Of The Attorney General To Be Held In 2014***

---

[9] As noted above in the section on ripeness, the 2013 Act is not yet law, and may never become law.  *See* discussion *supra*, at 7.  However, for the remainder of this merits analysis the District will assume, *arguendo*, that the 2013 Act will become a law in the form represented by Exhibit B.

Even though the 2013 Act obviously does nothing to impede the operation of the relevant provisions of the 2010 Act, Plaintiff advances several more nuanced—although still incorrect—arguments in support of his Motion.  To evaluate these arguments, a recitation of statutory interpretation under the laws of the District of Columbia will be helpful.[10]

The portion of the 2010 Act on which Plaintiff relies should be analyzed using the same tools of statutory interpretation as a normal statute, notwithstanding the fact that it amended the District of Columbia Charter.  *See District of Columbia Board of Elections and Ethics v. District of Columbia*, 866 A.2d 788, 795 (D.C. 2005) (using the "normal rules of statutory construction" to interpret a ballot initiative).  Courts will first look to the plain meaning of a statute, reading its words "in their ordinary sense and with the meaning commonly attributed to them," because "[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used."  *Peoples Drug Stores, Inc., v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983).  To determine the plain meaning of a provision, it must be read "together with other related provisions," rather than "in isolation."  *Carey v. Crane Service Co., Inc.*, 457 A.2d 1102, 1108 (D.C. 1983).  If the plain meaning of the text is unambiguous, then it is decisive, unless it would produce absurd results, lead to an obvious injustice, or would undermine the purpose of the statute.  *Dobyns v. United States*, 30 A.3d 155, 159, (D.C. 2011); *see also Cass v. District of Columbia*, 829 A.2d 480, 485 (D.C. 2003) ("With limited exceptions, unambiguous statutory language trumps all other considerations.") (citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

---

[10] Federal courts rely on state court precedent in interpreting matters of substantive state law.  *See generally*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), 28 U.S.C.A. § 1652.   State principles of statutory construction are considered substantive state law.  *See Phelps v. Hamilton*, 59 F.3d 1058, 1071 (10th Cir. 1995); *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 743-744 (7th Cir. 1989).   As a result, this brief generally cites to principles of statutory interpretation as set out by District of Columbia courts.

Even examining the 2010 Act and 2013 Act again, in context, nothing changes the outcome here. Although the operative portion of the 2010 Act was ratified by the electors of the District, its language was originally drafted by the Council through a series of bills. *See* Section I.B.4, below. The only restriction the 2010 Act—drafted by the Council—places on the timing of the attorney general election, other than requiring it to be "after January 1, 2014," is that it be held during the same election cycle as the Mayor. D.C. Code Ann. § 1-204.35(c). Thus, considered with the other relevant provisions, the Charter Amendment requires that the attorney general would be elected in 2014, 2018, or so on, *but not earlier. Carey*, 457 A.2d at 1108. This interpretation gives credence to the language used by the lawmakers. *Peoples Drug Stores*, 470 A.2d at 753. Indeed, if the Council had intended to place any further restrictions on the date of the election, it would have been simple to craft language that did so. *See Baumann v. District of Columbia*, 744 F.Supp.2d 216, 227 (D.D.C. 2010) (Upholding the plain language against plaintiff's argument that statute created an implied right of action because "[t]he D.C. Council knows how to create a private right of action when it wants to, and it clearly chose not to create one here."); *Rushing v. Leavitt*, 2005 WL 555415, *10 (D.D.C. 2005) (noting that the legislature "…knows how to include mandatory deadlines when it chooses."). For example, the Council could have proposed a Charter Amendment that provided the first election for attorney general would be "in 2014;" or "in 2014, after January 1;" or "after January 1, 2014, but before December 31, 2014;" or "between January 1 and December 31, 2014;" or "during calendar year 2014." But, to paraphrase *Baumann*, *supra*, the Council clearly chose not to use one of these obvious options here and, instead, opted for the open-ended construction "after January 1, 2014." D.C. Code Ann. § 1-204.35(e). The Council knows how to construct language that would limit the first election for attorney general to a year certain; it would be contrary to law to read the

2010 Act to include such a proscription since it clearly does not.  *Peoples Drug Stores*, 470 A.2d at 753.

### 3. *No Extrinsic Evidence Of The Meaning Of The 2010 Act Is Relevant Because Its Meaning Is Clear*

Because the text of the 2010 Act is so obviously against him, Plaintiff relies heavily on several extrinsic opinions about its meaning to buttress his case.  *See* [Dkt. No. 3] at 6-9 (citing an opinion by the General Counsel for the D.C. Council, testimony by the D.C. Attorney General, a summary by the D.C. Board of Elections and Ethics, and a memorandum by Latham and Watkins, LLP as probative regarding the meaning of the 2010 Act).   But such extrinsic evidence is irrelevant because the 2010 Act is not ambiguous, and its plain language does not produce an absurd result, an obvious injustice, or destroy the Act's purpose.  *Dobyns*, 30 A.3d at 159 (looking beyond the statute only appropriate if there is an ambiguity, or if the plain language is absurd, leads to an obvious injustice, or destroys the legislative purpose of the statute) (*citing Peoples Drug Stores*, 470 A.2d at 753).

### i.   Plaintiff Acknowledges That The 2010 Act Is Not Ambiguous

Plaintiff admits that the 2010 Act is not ambiguous.  [Dkt. No. 3] at 9 ("[e]ven if there was an ambiguity in the [2010 Act], which plaintiff denies…").  Given this admission, none of the extrinsic evidence about the meaning of the 2010 Act that he cites is relevant to resolve an ambiguity.  *Dobyns*, 30 A.3d at 159.  Plaintiff cannot have it both ways, by arguing that the statute is clear, but that this Court should look to outside sources to interpret its meaning.

However, to the extent Plaintiff is arguing *in the alternative* that the 2010 Act is ambiguous; the Court should reject that argument.  First, as explained above, there is nothing ambiguous about the plain language "after January 1, 2014."  Plaintiff cunningly proposes an unrealistic alternative that the word "after" only modifies "January 1," but not "2014."  [Dkt. No.

3] at 8.  D.C. Courts consistently reject such contorted constructions.  *See, e.g., Berkely v. D.C. Transit, Inc.*, 950 A.2d 749, 752 (D.C. 2008) (applying statute (D.C. Code § 51-110) that took effect "[f]or weeks commencing after March 15, 1983," to plaintiff in 2007, thus implicitly rejecting the idea that "after" only modified "March 15" and not "1983."); *National Broadcasting Co. v. F.C.C.*, 132 F.2d 545, 550 (D.C. App. 1942) (applying statute affecting "any station license after June 19, 1934" to license from 1941, thus implicitly rejecting the idea that "after" only modified "June 19" and not "1934."); *Thomas v. District of Columbia*, 942 A.2d 1154, 1162 (applying statute that affects "employees hired after September 30, 1987" to employee hired in 1998, thus implicitly rejecting the idea that "after" only modified "September 30" and not "1987.").   The absurdity of his assertion aside, the implication is that because Plaintiff can imagine an alternative meaning, the 2010 Act is ambiguous, and that extrinsic evidence should be considered.   But D.C. Courts also reject this use of a false dichotomy to create ambiguity, and this Court should follow their lead.  *See Carter v. State Farm Mut. Ins. Co.*, 808 A.2d 466, 471-472 (D.C. 2002) (finding statutory language defining "insurer" was clear such that analysis ended with the plain language, despite argument that context provided by other statutes gave an alternative meaning to the phrase); *Duvall v. U.S.*,  676 A.2d 448, 452-453 (D.C. 1996) (statute allowing jury to reach a verdict after member had been excused was unambiguous, and plaintiff's argument provided "no basis for disregarding the plain language of the [statute] or importing into that statute considerations or conditions with respect to which it is absolutely silent.").

     ii.   **The Plain Language Of The 2010 Act Is Not Absurd**

Plaintiff claims that the plain language of the 2010 Act, if read consistent with the 2013 Act to allow the election of the attorney general to be held in 2018, produces an absurd result.

[Dkt. No. 3] at 6-7.  Although he does not articulate it in the text of his Motion, the absurd result that the plain meaning of the 2010 Act supposedly dictates, according to Plaintiff's exhibits, is that the Council could, through normal legislation, delay the election for attorney general "indefinitely."  *See* [Dkt. No. 3-1] at 1, 8.  But this classic *reductio ad absurdum* argument fails because *its facts are not before the Court*.  The facts before the Court show only that faced with a Charter Amendment from the 2010 Act requiring an election to be held "after January 1, 2014" and that "shall coincide with the term of office of the Mayor" the Council excluded *only the earliest possible such date*.  *See* D.C. Code Ann. § 1-204.35.  While Plaintiff may argue that this delays the election eight years from the date of the referendum, the 2010 Act by its clear text only allowed elections that were four, eight, twelve, or other multiples of four years away.  *Id.*  So, again, a delay until 2018 is not absurd—indeed, any delay beyond 2014 is essentially mandated by the clear text of the 2010 Act.  *See also Eldred v. Ashcroft*, 537 U.S. 186, 208-210 (2003) (finding Congressional authority to extend the duration of existing copyrights was consistent with the constitutional requirement that copyrights only exist for "limited times.").

It is Plaintiff's proposed alternative interpretation of the 2010 Act that is truly absurd and wholly without support.  As explained above, Plaintiff believes that the phrase "after January 1, 2014" should be read so that "after" only modifies "January 1."  [Dkt. No. 3] at 8.  He believes Council's primary purpose in drafting this language then, was to clarify that, while the election must be in 2014, it could not be on January 1.  *Id.*  According to Plaintiff, this language was necessary to "confirm[] the accepted practice that no elections are held on New Year's Day."  *Id.*  Accepting for the moment that Plaintiff's supposed "practice" is true, the idea that the Council would use language that would be read to extend *the year* of the election, just to make clear that

it would not be held on *one day,* cannot be credited.[11]   Furthermore, even if January 1, being a holiday, was not a preferred date for an election, Plaintiff does not explain why the Council felt that date had to be excluded *in the text of a Charter Amendment*, while other days that would be equally inconvenient, such as Christmas, Thanksgiving, or July 4th, were not given similar treatment.   Compared to Plaintiff's bizarre interpretation of the 2010 Act, the Defendants' reading is not only imminently sensible, but consistent with recognized principles of statutory interpretation.

### iii.   The Plain Langue Of The 2010 Act Does Not Create Injustice Or Thwart The Purpose Of The Statute

Plaintiff also appears to argue that the Defendants' interpretation of the 2010 Act would create a manifest injustice, or would thwart the purpose of the statute.   [Dkt. No. 3] at 10 ("An open-ended Charter Amendment, with no start date, would not have a purpose or meaningful effect…. This case will literally decide whether the 640,000 citizens of the District of Columbia will live under a democracy or tyranny.").   But these propositions fail for the same reasons as already set out above.   Nothing in the Defendants' interpretation thwarts the purpose of the 2010 Act, because the purpose of the 2010 Act was to elect the attorney general at a time "*after January 1, 2014,*" not "*in 2014.*"   D.C. Code Ann. § 1-204.35(e).   Plaintiff simply cannot escape the plain language of the statute.   The 2013 Act does not thwart the purpose of the 2010 Act because they are entirely consistent with each other.   Likewise, it is foolish for Plaintiff to argue that the 2010 Act would not have a meaningful effect if the election for attorney general is not

---

[11]   Further, various special elections have been held on January 1 in this country.   *See, e.g.*, Wikipedia, "North Carolina's 7th congressional district special election," *at* http://en.wikipedia.org/wiki/North_Carolina%27s_7th_congressional_district_special_election,_ 1818 (last visited October 24, 2013); *and* Wikipedia, "List of special elections to the United States house of Representatives," *at* http://en.wikipedia.org/wiki/List_of_special_elections_to_the_United_States_House_of_Represe ntatives, (last visited October 24, 2013).

held until 2018.  The 2010 Act has already had, and continues to have, the salutary effect of laying the groundwork to turn an appointed position into an elected one.  The 2013 Act itself is evidence of progress towards this goal, as it includes numerous conforming amendments that would enact necessary requirements to run for attorney general, as well as articulates applicable campaign finance limits.  *See generally*, Exhibit A.  There is more work to be done; but just because the Council is taking time to finish what the 2010 Act started does not mean that it is thwarting the Act's purpose.

Likewise, there can be no manifest injustice where the 2013 Act is consistent with the 2010 Act.  Plaintiff only raises the specter of injustice by proposing a counterfactual situation— the indefinite delay of the election for attorney general.  *See* [Dkt. No. 3-1] at 1, 8.  But, as explained above, this question is not before the Court.  There is no injustice in delaying an election by a single election cycle.

Plaintiff has not demonstrated that the language of the 2010 Act is ambiguous, absurd, counter-purposeful, or unjust.  In the absence of any of these factors, the plain language controls, and the Council's passage of the 2013 Act must be upheld.  *Peoples Drug Stores*, 470 A.2d at 753.

**4.  *Nothing Extrinsic To The 2010 Act Proves That The Council Intended To Mandate An Attorney General Election In 2014***

Even looking beyond the text of the 2010 Act, no external factor saves Plaintiff's case. The vast weight of the evidence, including the text itself, indicates that whether or not the Council *hoped* that the first election for attorney general would be in 2014, it deliberately did not restrict itself to that date.  Nothing Plaintiff cites is to the contrary.

Some basic legislative history will be helpful here.  The 2010 Act was introduced as Bill 18-65 by then-Councilmember Mendelson on January 6, 2009.  *See* LIMS printout concerning

Bill 18-65, attached as **Exhibit D**.  On February 1, 2009, Councilmember Mendelson amended Bill 18-65 and first inserted the language requiring that the first election be held "after January 1, 2014."  *See* Mendelson AINS B18-65, attached as **Exhibit E**.  Then, on February 2, 2009, Councilmember Wells proposed an Amendment in the Nature of a Substitute to Bill 18-65 that also included the date of the first election, but required it to be held "*in 2014*."  *See* AINS B18-65, attached as **Exhibit F**.  The Council rejected Councilmember Wells' amendment, thereby rejecting the definite restriction on when the first election could be held as well.

Against this history, Plaintiff first relies on a memorandum prepared by John Hoellen, Deputy General Counsel for the District of Columbia Council (the "DGC Memo").  [Dkt. No. 3-1] at 1.  This memorandum, in turn, relies only on: (1) The already discredited argument that because delaying the attorney general election indefinitely would contravene the intention of the 2010 Act and the Charter Amendment, the Council cannot delay the election at all; and (2) Councilmember Mendelson claiming that his amendment to Bill 18-65 would "clarify" that the first attorney general election "shall [be] in 2014."  *See* Exhibit E, at 15.  But Councilmember Mendelson is only one of thirteen, and his understanding does not establish the intent of the other Councilmembers.  *C.f. Nixon v. District of Columbia Dept. of Employee Services*, 954 A.2d 1016, 1024-1025 (D.C. 2008) (the intent of the Council would not be broadly construed to apply statute retroactively where not all Councilmembers had expressed unequivocal support for that proposition).  Indeed, Councilmember Mendelson's language is opaque at best, given how divorced it is from the language of the amendment he is introducing.  More importantly, the full Council accepted Councilmember Mendelson's language giving only an indefinite date for the first election of the attorney general, and explicitly rejected Councilmember Wells' amendment

requiring the election to be "in 2014." Exhibit C. This strongly indicates the Council knew what it was doing—it could have used definite language if that were its intent and chose not to do so.[12]

As already mentioned, the Council knows how to create mandatory deadlines through legislation. *Rushing*, 2005 WL 555415, *10. Indeed, the D.C. Code is rife with examples. *See., e.g.*, D.C. Code Ann. § 1-1001.09(e)(3) (2012 Supp.) (hearing to defend a challenged ballot must take place between 8 and 10 days post-election); *id.* § 1-1163.27(a) (2011 Supp.) (a transition committee terminates no later than 45 days from the beginning of the new Mayor of Council Chairman's term); *id.* § 1-309.06(a) (2011 Supp.) (ANC Elections will take place beginning in 1984); *id.* §7-2071.03(b)(E)(3) (2006 Repl.) (Health Care Ombudsman Program's first evaluation will take place no later than two years after April 12, 2005). The fact that the Council did not establish a firm deadline for the first attorney general election—and its rejection of Councilmember Wells' amendment containing an explicit date requirement—strongly supports the conclusion that it did not intend to create one. *See Barnhart v. Sigmon Coal, Co.*, 534 U.S. 438, 452 (2002) (noting the recognized principle of statutory construction that when "Congress includes particular language in one section of a statute but omits it in another section ..., it is generally presumed that Congress acts intentionally and purposely.").

Moreover, the fact that the DGC Memo was provided to the Council on July 2, 2013, and they disregarded it by passing the 2013 Act strongly implies that the Council itself did not

---

[12] It bears noting that Councilmember Wells' amendment also offers many other substantive changes to Bill 18-65 besides the more definite date. Exhibit F. Because we cannot know why each Councilmember rejected this amendment, it is not possible to know whether the rejection was based solely on the definite date, solely on other issues, or a combination. However, what is indisputable is that, through Councilmember Wells' amendment, the whole Council was put on notice of the contrast between an election that would take place "after January 1, 2014, and one that would take place "in 2014." If the Council had intended to adopt the definite date offered by Councilmember Wells, it would have been simple to offer a more limited amendment adopting only that language. The Council did not make this choice, and the presumption is that action was purposeful. *Baumann*, 744 F.Supp.2d at 227.

believe that memo accurately represented the intent of the 2010 Act.  Notably, of the eight

Councilmembers who supported the 2013 Act at the final vote—Councilmembers Evans,

Bowser, Bonds, Orange, Barry, Cheh, Alexander, and Graham—*six* were on the Council in 2010

when Bill 18-65—the original legislation that would lead to the 2010 Act—was proposed and

passed.[13]  *See* Exhibits C and D; *and* Partial D.C. Council Voting Record on Elected Attorney

General Issue, attached as **Exhibit G**.  By disregarding the DGC Memo, and voting for Bill 20-

134, these Councilmembers clearly did not believe that the language of the Charter Amendment

required them to hold the first election in 2014.  *See Jackson v. District of Columbia Board of*

*Ethics and Elections*, 999 A.2d 89, 106 (D.C. 2010) (passage implementing legislation by

councilmembers who were also partly "Framers" of underlying Charter amendment relevant fact

for determining intent at time amendment was passed). The DGC Memo is not authoritative, was

disregarded by the Council, and cannot outweigh all the contrary evidence of the Council's intent

regarding the timing of the attorney general election.  It should be likewise disregarded by this

Court.

   Plaintiff also relies on testimony by the current Attorney General, Irvin Nathan, from

March 23, 2013.  [Dkt. No. 3] at 7.  This reliance is obviously flawed because it simply reads too

much into Mr. Nathan's statement that the "elected Attorney General will, by law, take office in

January 2015."  *Id.*  This is not a statement about what the 2010 Act *requires*, and is more in line

with a prediction about the then-supposed future of the office.  Mr. Nathan made it clear that this

was not his interpretation of the requirements of the 2010 Act when his office issued a

memorandum (one that has been liberally sampled in this Opposition) stating that "a fair reading

---

[13] Councilmember Bowser was on the Council in 2010, but absent at the final reading of Bill 18-65.  However, because she was on the Council, it is reasonable to imply that she was also contemporaneously aware of the meaning attributed to the language in that bill by the Council.

of the Charter [A]mendment and the accompanying legislation permits [delaying the election beyond 2014]." *See* Memorandum from Irvin B. Nathan to the Honorable Jack Evans, dated July 9, 2013, attached as **Exhibit H**.

Plaintiff's most interesting contention is that statements by BOE "clarified" the 2010 Act, and that Plaintiff's interpretation of the 2010 Act has been "ratified" by BOE's conduct. [Dkt. No. 3] at 8-9. The first contention—that BOE's action in promulgating a short title and summary statement somehow had a legal effect on the operation of the 2010 Act—is easily dismissed. Plaintiff admits, and his entire claim depends on the proposition that even the D.C. Council "cannot overrule, amend or nullify a Charter Amendment." *See* [Dkt. No. 3] at 5, *quoting Price*, 645 A.2d at 599. Given that proposition, it is impossible that BOE, a mere executive-level agency, could have "clarified" anything about the 2010 Act. The text of the 2010 Act stands as it was enacted. BOE could have told the voters that the Charter Amendment stated the first election for attorney general would occur "when the lion lays down with the lamb" and it would not make that the law. All levity aside, BOE takes its duty to prepare short titles and summary statements for Charter amendments very seriously. Summary statements are to be impartial, accurate, and reflect the meaning and intent of the amendment. DCMR § 3-1802.2. However, they must also be no more than 150 words, and must not create prejudice for or against the measure. DCMR § 3-1802.1(a) – 1802.2. These statements are composed at public meetings, and are then published in the D.C. Register for comment, *along with the full text of the proposed amendment*. DCMR § 3-1802.1, 1802.4. Given the forgoing, the fact that the summary statement for the Charter Amendment portion of the 2010 Act said it meant voters "would begin voting for the Attorney General *in 2014*" instead of "*after January 1, 2014*" is an unfortunate, but understandable, minor discrepancy. *See* District of Columbia Board of Elections and Ethics

Public Notice, dated 9/13/10, attached as **Exhibit I**.  But this does not change the fact that the law controls the summary statement, not the other way around.  *Price*, 645 A.2d at 599.  The 2010 Act is clear; the 2013 Act is lawful.

As with his contentions about the BOE summary statement, Plaintiff's claim that BOE "ratified" having an election in 2014 "by conduct" misunderstands the nature and significance of BOE's actions.  BOE is an independent agency of the District of Columbia, bound to follow the law and follow the D.C. Charter.  D.C. Code Ann. § 1-1001.06.  After the passage of the 2010 Act, BOE operated under the assumption that the first attorney general election would be in 2014, not because that was mandated, but because there was no counter-indication.  However, because the 2010 Act and accompanying Charter Amendment only *allows* the election of the attorney general, and does not implement a variety of necessary conforming amendments concerning campaign finance and other election laws, BOE was still waiting on the Council for some guidance.  This summer the Council debated the 2013 Act, which included the various conforming amendments necessary to fully implement an election for the attorney general.  *See*, Exhibit A at 10; Exhibit B at 9-14.  But, in the process, the Council also decided to attach an amendment that delayed the election until 2018.  *Id.*  Given that situation, BOE indicated on its website that the election for attorney general in 2014 was doubtful.  [Dkt. No. 1-1] at 2-3 ("An asterisks [sic] (*) now appears on all [BOE] documents, warning any potential candidates for Attorney General that the inclusion of Attorney General as an elected office is likely to be short-lived…").  So BOE is not "ratifying" anything by conduct.  Instead, it is operating exactly as one would expect a law-abiding agency to operate in a situation where the law is subject to change.  Certainly BOE's actions cannot change the text of the 2010 Act any more than its words could,

as explained above.  So, Plaintiff's reliance on anything done by BOE to interpret the text of the

2010 Act is profoundly misplaced, and does not indicate any likelihood of success on the merits.

Finally, Plaintiff also relies, as mentioned above, on a memorandum drafted by Latham &

Watkins, LLP.  [Dkt. No. 3-1] at 3.  This memorandum is of no legal significance whatsoever,

and its arguments have already been discredited, above.  It should be ignored by the Court.  In

light of the foregoing, Plaintiff cannot succeed on the merits of its claim, and his Motion must be

denied.

## II. PLAINTIFF HAS NOT DEMONSTRATED ANY HARM JUSTIFYING PRELIMINARY INJUNCTIVE RELIEF

Because the 2010 Act does not create a right to vote for the attorney general *in 2014*,

there is no harm to Plaintiff's voting rights in postponing that hypothetical election.  *C.f.*

*Armfield v.U.S.*, 811 A.2d 792, 797 (D.C. 2002) (dismissing equal protection claim based on

inability of District resident to vote for Congress because plaintiff's complaint stemmed from the

Constitution, and "as a matter of simple logic, the Constitution cannot be in contravention of

itself").  Here, similar to *Armfield*, Plaintiff's problem is not that the Council, through the 2013

Act, denied his right to vote for an attorney general in the 2014 election cycle, but that the 2010

Act, by which he tries to vindicate his supposed rights, specifically allows that "denial" or, better

put, "postponement."  D.C. Code Ann. § 1-204.35(e).[14]  Needless to say, without showing *any*

harm arising from the 2013 Act, Plaintiff cannot show *irreparable* harm, and his claim fails.

*Henke*, 842 F.Supp.2d at 58-59.

---

[14] To the extent Plaintiff asserts that the 2010 Act's *Charter Amendment* is unconstitutional, of course, he encounters the larger problem that without the Charter Amendment there is no right to vote for attorney general *at all*.  But these philosophical knots are the predictable consequence of trying to use an un-textual interpretation of the Charter Amendment to invalidate the consistent language of the 2013 Act.

### III. THE BALANCE OF THE EQUITIES SUPPORTS DENIAL OF PLAINTIFF'S MOTION

On the other hand, granting Plaintiff preliminary injunctive relief would be extremely burdensome on Defendants.   At this junction, Defendants, and the District, generally find themselves in a curious spot, but one from which the Court could do them great harm if Plaintiff's motion were granted.   Through the 2013 Act, the Council has authorized important and necessary conforming changes to election law that are *necessary* for electing an attorney general.   Exhibit A at 10; Exhibit B at 9-14.   Through that same legislation it also delayed the election for attorney general.   *Id.*   Obviously the Court cannot strike down the 2013 Act in its entirety, as Plaintiff has requested.   [Dkt. No. 1-1] at 8 (requesting, *inter alia*, "[a] final order holding that [the 2013 Act] is unconstitutional and void…").   Such action, in conjunction with his request that the Court prohibit BOE from removing the attorney general from the ballot, would essentially require an election to be held, but prevent attorney general candidates from being subject to procedural prerequisites or campaign finance laws, a proposition that is surely more inimical to the political process than delaying the election to 2018.   [Dkt. No. 1-1] at 7.

Furthermore, even if the Court were tempted to interfere in the operations of the Council by preliminarily striking down *only part* of the 2013 Act, and also enjoining the removal of the attorney general from the ballot, the 2013 Act *is not yet law*, and will not become law for some time.   *See* Exhibit C.   As a result, putative attorney general candidates would still operate without campaign finance restrictions for weeks, and possibly months, until the passive review period for Congress was over.   The 2013 Act, because of when it was passed, *depends on* the delay of the election until 2018 to function logically and ensure a fair electoral process.   The legal and political fallout from injunctive relief disassembling only part of the 2013 Act is unknown, but it

could surely be dire.[15]   In order to prevent this outcome, the Court essentially would have to *order the Council to affirmatively enact emergency legislation*, modeled on the 2013 Act, but without the delay of the attorney general election.   "But no court can order a legislature to enact a particular statute so as to achieve a result that the court might consider desirable or appropriate money for a purpose that the court might deem worthy of being funded."   *Dean v. District of Columbia*, 653 A.2d 307, 362 (D.C. 1995) (Terry, J. in concurrence) (*citing Zahn v. Board of Public Works*, 274 U.S. 325, 328 (1927).   Nor could the Court grant injunctive relief "prohibiting the D.C. Council from taking any action to overturn, frustrate or undermine the Charter Amendment…."   [Dkt. No. 1-1] at 7.   "[T]he application to enjoin the passage of any resolution, order or ordinance… is an application to enjoin a legislative body from an exercise of legislative power, and to enjoin the exercise of such power is not within the jurisdiction of a court of equity."   *Hearst v. Black*, 87 F.2d 68, 68 (D.C. App. 1936).   Plaintiff invites this Court to become mired in a complex political question, engage in judicial legislation, and risk causing more harm than good.   The Court should decline his offer.

## IV. THE PUBLIC INTEREST DISFAVORS ISSUANCE OF THE RELIEF PLAINTIFF SEEKS

In this case, the interests of Defendants and the general public are largely coterminous. However, even if they were not, as already mentioned, the harm Plaintiff fears is merely a delay of the attorney general election until the next mayoral cycle that results in lower voter turnout and "chills" the electoral process.   [Dkt. No. 3] at 10-11.   But a chilling effect by itself is not sufficient to prohibit government action.   *See Scolaro v. District of Columbia Bd. of Elections*

---

[15] Picture, for example, an attorney general candidate, temporarily operating outside the realm of campaign finance laws, who amasses a huge amount of money through what would otherwise be illegal means once the 2013 Act took effect, and then uses that money to get elected to the now powerful independent position.   Against this specter of outright legal corruption, Plaintiff's concern about low turnout and "voter lethargy" are insignificant.   [Dkt. No. 3] at 11.

*and Ethics*, 946 F.Supp. 80, 83 (1996) (*citing Younger v. Harris*, 401 U.S. 37, 51-52 (1971). Especially here, where Plaintiff asks this Court to enact through an order what the Council has declined to enact through the legislative process.   Allowing the elected representatives of the District to implement the election of the attorney general through appropriate legislation is both consistent with a fair electoral process, and with the public interest.   The equities weigh against any sort of injunctive relief.

<h2 style="text-align:center;">CONCLUSION</h2>

Injunctive relief is entirely inappropriate.   As an initial matter, Plaintiff does not even have standing to bring this claim, because he asserts a generalized grievance that is better dealt with through the political process.   Further, even if this claim were appropriate for adjudication, it is not ripe.   The 2013 Act—which Plaintiff claims violates his rights—is not even a law at this time, and will not be for weeks until passively approved by the Congress.   Exhibit C.   But, even if the legality of the 2013 Act is squarely before the Court, delaying the attorney general election until 2018 is clearly consistent with the 2010 Act's requirement that said election be "after January 1, 2014."   D.C. Code Ann. § 1-204.35(e).   Plaintiff's proposed interpretation to the contrary is not supported by law, logic, or the legislative history.   Because the 2013 Act is consistent with the 2010 Act and its Charter Amendment, Plaintiff is not being denied the right to vote, the right to due process, or the protection of the Charter.   [Dkt. No. 1-1] at 5-7.   In addition, because Plaintiff has not articulated a proper right that is being infringed, he also cannot show any irreparable harm, and requests relief that would cause extensive problems for the District government and voters.   Injunctive relief on these grounds would be profoundly misguided.   Plaintiff's claim is manifestly deficient, and so his Motion should be denied.

DATE:  October 30, 2013

Respectfully Submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN EFROS
Deputy Attorney General, Public Interest Division

/s/ Grace Graham
GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section

/s/ Keith D. Parsons
KEITH D. PARSONS, D.C. Bar No. 1006935
Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 727-6247
Fax:  (202) 741-8935
Email: keith.parsons@dc.gov

/s/ Matthew R. Blecher
MATTHEW R. BLECHER, D.C. Bar No. 1012957
Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 442-9774
Fax:  (202) 730-0586
Email: matthew.blecher@dc.gov

*Counsel for Defendants*