## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| PAUL ZUKERBERG, | ) | |
| Plaintiff | ) | Case No. 1:13-cv-01557-JEB |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA BOARD OF | ) | |
| ELECTIONS AND ETHICS and COUNCIL | ) | |
| OF THE DISTRICT OF COLUMBIA, | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## HIS MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff, Paul Zukerberg, through counsel, and on behalf of himself and all D.C. voters, respectfully submits this reply brief in support of his motion for a preliminary injunction. Plaintiff seeks to enjoin the provision of D.C. Council Bill 20-134, the "Elected Attorney General Implementation Amendment Act of 2013" (the "2013 Act") that would delay the planned 2014 election of the D.C. Attorney General, namely, B20-134 at 14-15 (the "Delay Provision") (attached as Ex. B to Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction [Dkt No. 7] ("Opp.")). Absent the requested injunction, the election for attorney general for the District of Columbia will be removed from the ballot for partisan election in 2014, in violation of the D.C. Charter, as amended.

## INTRODUCTION

Defendants show disregard for the voters of the District of Columbia. On Election Day, November 2, 2010, voters overwhelmingly approved a D.C. Charter amendment that would require the D.C. Attorney General to be publicly elected starting

with the 2014 election.  Summary language on the ballot itself, distributed to every voter, read:

> **If voters approve of this amendment…residents of the District of Columbia would begin voting for the Attorney General <u>in 2014</u>.**

Opp. at Ex. I (emphasis added).

It was a landslide: over 75% voted "Yes" to the election of the Attorney General "in 2014."  Amending the D.C. Charter is a two-step process: first the D.C. Council ("Council") passes legislation, then the public votes by ballot referendum.  This popular vote for the election "in 2014" followed the Council's 2010 Act, the "Attorney General for the District of Columbia Clarification and Elected Term Amendment Act of 2009," D.C. Law 18-160 & 18-160A, codified at D.C. Code §§1-204.35, 1-301.81 ("2010 Act").  The 2010 Act contains various provisions about the to-be elected office, including that it be a "partisan" election (*i.e.*, with primaries) and that there be a four-year term to "coincide with the term of office of the Mayor."  D.C. Charter §435(a), (c); D.C. Code at §1-204.35(a), (c).  The 2010 Act also states that "the first election for the position of Attorney General shall be after January 1, 2014."  D.C. Charter §435(e), codified at D.C. Code at §1-204.35(e).

Thus, it is no coincidence that the election was described to the voters as one that would take place "in 2014."  The term must coincide with that of Mayor, whose next election would be 2014.  Thus, the Board of Elections & Ethics ("BOE") duly placed the office of elected attorney general on the 2014 ballot along with the other partisan elections for Mayor and Council. Without exception, every interested office and person accepted and understood that the election would be held <u>in 2014</u>:  the Council and BOE

("Defendants"), the D.C. Attorney General, and most importantly, the voters. Indeed, BOE is prepared to proceed with the April 2014 primary election for Attorney General.

But recently certain members on the Council decided by ordinary legislation to attempt to overrule the voters' Charter amendment and push the election off at least until 2018, possibly later. The Council's own lawyer told them this would be improper. Nevertheless, a majority of Councilmembers passed the 2013 Act. The 2013 Act clarifies or implements other aspects of the 2010 Act, and in this case, Plaintiff challenges only the Delay Provision, which provides that the Charter-mandated election "shall not be before January 1, 2018" (with an indefinite window thereafter for its occurrence).

When it has served their interests, the Council has ignored voter initiatives before, such as the voters' call for term limits. What is different this time is that the voters amended the D.C. Charter itself. The Council simply cannot contravene the Charter through ordinary legislation. Whether the Council's motives behind the Delay Provision are good, bad, or in between, does not matter. Motives aside, their Act is <u>illegal</u>. The Attorney General himself understandably disapproved of the Council's Act as, at a minimum, imprudent. Indeed, the Act is an embarrassment for the Council, who otherwise purport to be champions of D.C. voting rights. But such hypocrisy aside, the 2013 Act simply cannot stand as a matter of law. The Charter requires the election to proceed, as planned, in 2014.

In their opposition, Defendants raise several arguments, none of which avoid the injunction that should now issue to nullify the Council's illegal Delay Provision. *First*, Defendants say the matter is not "ripe" for review because the Congressional review period has not passed. The review will pass no sooner than December 20, 2013,

later if Congress recesses.  Plaintiff and the voters cannot wait for this formality, the review period, to pass.  The Delay Provision is presently causing irreparable injury-in-fact.  The Delay Provision has deterred candidates from announcing, raising funds, and campaigning. The window to declare candidacy for the office is now, and nobody has – until today, when Mr. Zukerberg formally declared his candidacy.  *See* **Ex. 1** hereto (his Supplemental Affidavit, attaching his formal Declaration of Candidacy).

November 8, 2013 is the date for all candidates to pick up signature petitions and January 2, 2014 is the date to turn them in, with other paperwork.  *See* **Ex. 2** hereto, http://www.dcboee.org/popup.asp?url=/pdf_files/nr_1187.pdf.  There is already precious little time for the process to follow its planned course, even if, by some miracle, Congress does not recess and the passage period ends on December 20 (leaving 11 days until the January 2 deadline).  If potential candidates await the Congressional review period before taking the actions they must to qualify for the ballot, it will be too late.  The election demanded by the voters will have effectively been killed.  The injury is real, to both candidates and voters.  Voters will not have time to vet the candidates, and candidates will not have time to obtain the required signatures.

*Second*, Defendants say that Plaintiff does not have legal standing to challenge the Council's attempt to override the will of the voters.  Plaintiff has declared his candidacy for the office (as also reflected in his Amended Complaint, filed herewith).  This moots the issue of lack of standing as binding D.C. Circuit precedent establishes his standing as a candidate.  Even as a voter, this is not a case of "generalized" voter grievance, it is a case about an Act that purports to directly strip the voters of their vote.  Governing case law, reviewed below, supports standing on this alternative basis.

*Third*, Defendants present a flawed interpretation on the merits.  The 2010 Act provides that the election shall be "after January 1, 2014."  Defendants say "after" can be any time after: "2018, 2022, or so on."  Opp. at 16 (emphasis added).  Thus, Defendants argue, the Council can simply trump the will of the voters, rendering the Charter amendments in the 2010 Act illusory.  This is a recently concocted argument with no support in the legislative text, history, or otherwise.  Consider the undisputed evidence:

- **Voter intent**.  The voters who ratified the 2010 Act affirmed a ballot question that the election shall be "in 2014."  Their intent was and is clear.  Defendants show disdain for the voters when they argue that the ballot was an "unfortunate mistake."

- **Legislative intent**.  The architect of the 2010 Act, then-Councilmember Judiciary Committee Chair Phil Mendelson, wrote an explanatory memorandum stating that the intent was for the election to take place "in 2014."  This is the only evidence of legislative intent (as reviewed below, Defendants misrepresent a proposal by Councilmember Wells)

- **BOE intent**.  The ballot summary stating "in 2014" was drafted and approved by BOE, with Council opportunity to review and correct, evidencing their intent and interpretation at the time.  This also an agency interpretation subject to deference.

Certainly, nobody ever made the Defendants' "forever after" argument until very recently.  The Council's own lawyer rejected the Defendants' position.  Even the Attorney General himself testified, in 2012, that the election must take place in 2014, "by law."  This crafty contention of the word "after" is not a plausible reading of the 2010 Act.  The proper interpretation of the Voters' Act is that the election must be held <u>in 2014</u>.  There is no ambiguity in this regard; there are not two reasonable interpretations of the same language.  But even if there is ambiguity within the four corners of the 2010 Act itself, the extrinsic evidence – without exception – weighs unanimously in favor of the interpretation that protects the voters' will.

*Fourth*, there can be no legitimate argument on the other factors for a preliminary injunction.  Absent an injunction, plaintiff and the voters are irreparably injured.  The moment to enforce the 2014 election will soon pass.  The "balance of equities" and the "public interest" are with the voters.  An injury to fundamental voting rights is the most egregious in our system of laws.

Sadly, the voters who demanded an election in 2014 have been abandoned on this issue by their Council.  But the Council does not have the discretion to override the will of the voters; they must respect the Charter provision that requires the election to proceed in 2014.  This Court can and should redress this injury caused by the Delay Provision.

## ARGUMENT

Plaintiff first addresses the Defendants' two threshold arguments, then turns to the four elements for a preliminary injunction:   likelihood of success on the merits, irreparable harm, balance of equities, and public interest.

## I.      This Case is Ripe for Review

Defendants argue that this matter is not ripe for review because the 2013 Act still awaits passage of the period of Congressional review, during which time Congress might invalidate the 2013 Act.  The earliest the review period will pass is Dec. 20, 2013, but that would be delayed by a Congressional recess of over three days.  Opp. at 4 & Ex. C thereto.  A recess is highly likely.  According to the Council, due to its usual fall recess, "any act passed by the Council after July usually will not become law until the following year.  Therefore, it can take up to 4 months for an act to become law."  *See* **Ex. 3** hereto, http://dcclims1.dccouncil.us/lims/faq.aspx#6.  Moreover, the last time Congress overrode

a D.C. act was 1991 and they have only done so on three occasions.  S.J. Res. 84, 102d Cong. (1991); H. Res. 208, 97th Cong. (1981); S. Con. Res. 63, 96th Cong. (1979).

The passing of the Congressional review period is not a substantive moment, but is more of a "rubber stamp."  Even the BOE currently explains on its website that it was the Mayor's review that was the relevant moment, without mention of the Congressional review period.  *See* **Ex. 4** hereto, http://www.dcboee.org/candidate_info/general_info/ ("[t]he office of Attorney General is tentatively included in the list of offices to be elected in 2014, pending the Mayor's review of Bill 20-134"); **Ex. 2** hereto, http://www.dcboee.org/popup.asp?url=/pdf_files/nr_1187.pdf ("The elected office of Attorney General is tentatively included in the list of offices appearing on the April 1, 2014 Primary ballot pending the Council's consideration and the Mayor's review of Bill 20-134").  Defendants' argument is hollow and, at best, is form over substance.

The injury-in-fact will not start when the perfunctory Congressional review period passes.  **The injury is happening now.**  The election is in April, and in advance, candidates must declare and submit 2000 petition signatures – by January 2, 2014.  Those blank petitions will be available November 8, 2014.  Even if the Congressional review period expires on December 20, 2013, that would leave only 11 days to collect 2000 signatures, including Christmas and New Year's Day.

Usually candidates declare earlier than the deadline, hire a treasurer and raise funds, and start campaigning.  But the 2013 Act is presently having a clear chilling effect on the field – nobody has declared a candidacy, other than Mr. Zukerberg's declaration today.  With the 2013 Act hanging over the 2014 election like the sword of Damocles, there is a substantial disincentive for any candidate to declare, raise funds, and engage

voters.  Voters likewise would have little interest in making campaign contributions.  The Delay Provision, until enjoined, has effectively killed the 2014 election.

As Defendants concede (Opp. at 26), the BOE indicates on its website that the election for attorney general is "doubtful."  [Dkt No. 1-1] at 2-3.  Asterisks warn away all potential candidates that the BOE process in place is likely to be short-lived.  There could not be more specific and immediate evidence of the injurious chilling effect of the Delay Provision, notwithstanding the formality that the Congressional period has not passed.

As Defendants correctly anticipate in their opposition, that is why this one of those "occasions in which courts permit pre-enforcement challenges to statutes and regulations."  Opp. at 8, citing *Abbot Labs. v. Gardner*, 387 U.S. 136 (1967).  There, the existence of a regulation that had yet to be enforced placed the petitioners in an "untenable position" of choosing between compliance (and incurring economic hardship) or not complying (and risking enforcement).  There is an analogous "untenable position" faced here by potential candidates that makes the impact of the 2013 Act "sufficiently direct and immediate as to render the issue appropriate for judicial review" prior to the formality of the passing of the Congressional review period.  *Id*. at 152.

Plaintiff's declaration as a candidate also fully moots Defendants' ripeness arguments.  In *LaRoque v. Holder*, 650 F.3d 777, 786-87 (D.C. Cir. 2011), a political candidate challenged the federal government's refusal under the Voting Rights Act to "preclear" a proposed amendment to a city charter providing for a non-partisan system for electing the mayor and city council.  The candidate wanted to avoid the partisan primary election process, possibly mooted by the government's pre-clearance, but he would be injured otherwise by the time and expense of complying with the partisan

8

process.  He had not yet experienced any actual injury, however, as the election process had not commenced – he had merely declared his candidacy and done nothing more (precisely like Mr. Zukerberg at this juncture).   In upholding plaintiff's standing (as further addressed below), the court noted that the candidate did not have to wait until he actually started incurring costs and other injury in the primary process itself.  The court ruled that his injuries were sufficiently "imminent" to be real and so the court could address the merits.  *Id*. at 787.  In granting standing, the court, in effect, also ruled that the matter was ripe for review.

## II.   Plaintiff Has Standing to Challenge the 2013 Act

The parties agree on the well-established three-part test for standing:  injury-in-fact, causation, and redressibility.  Opp. at 10, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Defendants standing argument is now mooted by Plaintiff's declaration of candidacy for the office of Attorney General.   The controlling case is *LaRoque*, where the D.C. Circuit ruled that a voter who intended to run for political office had both Article III and prudential standing to challenge the government's refusal under the Voting Rights Act to "preclear" a proposed amendment to a city charter providing for a non-partisan system for electing the mayor and city council.  650 F.3d at 786-87.  As a candidate, he had standing because of the significant amounts of time and resources involved in his appearing on the ballot and complying with all requirements. *Id*.  As a result of the 2013 Act, plaintiff's injury as a candidate is real and immediate, it is caused by the Act, and it is redressible by an injunction.

While it is rendered academic, Plaintiff also has standing in his capacity as a voter.  As a voter, he does not have a mere "generalized" grievance about a law.  The

2013 Act purports to override the voters' own referendum to amend the D.C. Charter to require that they vote for attorney general in 2014.   The 2013 Act directly and immediately causes injury to the voter, which is redressible by an injunction.  This is not a case like *Lance v. Coffman*, 549 U.S. 437, 439 (2007), where voters challenged a court-ordered redistricting plan that impacted their voting districts.  A voter challenge is too general when it is to such measures that relate to the voting districts or the manner and means of voting.  But here, the entire D.C. electorate would be deprived of a vote that they demanded in the 2010 election and which the D.C. Charter provides.  Defendants' notion that a voter has no standing to challenge this total deprivation is incorrect.  Indeed, in their Opposition at footnote 7, Defendants cite an on-point applicable precedent, *League of United Latin Am. Citizens v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011), "distinguishing *Lance*, holding that 'complete deprivation of [the] right to vote' confers standing even if shared by the entire electorate."

Also apposite is *Federal Elections Commission v. Akins*, 524 U.S. 11 (1998). There, the Supreme Court upheld standing for a group of voters who could not obtain an organization's donor lists that the Federal Election Campaign Act (FECA) allegedly required the organization to make public.  This voter grievance satisfied the "injury in fact" requirement for Article III standing, despite a claim that the action involved only a "generalized grievance"; there was no reason to doubt the voters' claim that the information would help them and others to evaluate candidates for public office, especially candidates who received assistance from the organization, and to evaluate the role that the organization's financial assistance might play in a specific election.  As the Court concluded, "[t]he fact that a political forum may be more readily available where

an injury is widely shared…does not, by itself, automatically disqualify an interest for Article III purposes…This conclusion seems particularly obvious where…large numbers of voters suffer interference with voting rights conferred by law." *Id*. at 24. The same is true here, where voters *en masse* are suffering an interference with their voting rights.

## III.    Plaintiff Succeeds on the Merits

Defendants correctly acknowledge that if the Delay Provision of the 2013 Act, which is "ordinary legislation," contravenes the D.C. Charter, the Delay Provision must be struck down. Opp. at 13, citing *Price v. District of Columbia Board of Elections and Ethics*, 645 A.2d 594, 600 (D.C. 1994) (invalidating legislation regarding signature petitions because it contradicted a Charter amendment). Defendants also acknowledge that "a right to vote created by [D.C.] law is of course subject to federal court protections." Opp. at 13, citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Thus, the "likelihood of success on the merits" turns on an interpretation of the 2010 Act with regard to the timing of the Attorney General election.

### A.    The Rules of Interpretation

It is important to articulate the rules of interpretation of the 2010 Act in this regard. The starting point is always statutory language, to see if there is a "plain and ordinary" meaning. *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (courts look first to statutory words as used in their "ordinary sense"). Statutory language must be read "together with other related provisions," rather than in "isolation." *Carey v. Crane Service Co., Inc.*, 457 A.2d 1102, 1108 (D.C. 1983). *See also Hessey v. District of Columbia Bd. Of Elections and Ethics*, 601 A.2d 3 (D.C. 1991) (amendments to the D.C. Charter cannot be viewed in a vacuum).

The process necessarily involves looking beyond the statutory language. "The court may appropriately look beyond plain meaning, however, where (1) 'a review of legislative history or an in-depth consideration of alternative constructions' of the statutory language reveals ambiguities that the court must resolve; (2) the literal meaning of the statute 'produces absurd results'; (3) the plain meaning construction leads to an 'obvious injustice'; or (4) refusal to adhere to plain meaning is necessary in order to 'effectuate the legislative purpose' of the statute as a whole." *Dobyns v. United States*, 30 A.2d 155, 159 (D.C. 2011).

D.C. Courts take legislative history into account when interpreting statutory language. "[E]ven where the words of statute have a 'superficial clarity' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve." *District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006). In the Charter context in particular, the Council's intent becomes even more significant. *See Jackson v. D.C. Bd. of Elections & Ethics*, 999 A.2d 89, 100-01 (D.C. 2010) (it is "paramount" to consider the Council's intent when assessing a Charter amendment approved by voters through a referendum); *Stevenson v. D.C. Bd. of Elections & Ethic*s, 683 A.2d 1371, 1376 (D.C. 1996) (looking to legislative history in assessing the Council's intent when interpreting a Charter amendment approved through referendum).

### B.     The Charter Unambiguously Requires the Election to be in 2014

The 2010 Act, in relevant part, provides that "[t]he first election for the position of Attorney General shall be after January 1, 2014" and "shall coincide with the term of office of the Mayor." Every provision of the 2010 is consistent with the Attorney

General election taking place <u>in 2014</u>.  A plain reading of the language is that the election shall take place in 2014.

There is no other plausible reading.  Defendants argue that "after" means any time after, no matter when that may be.  They say: "<u>All possible election dates</u> that are 'not before January 1, 2018' are also 'after January 1, 2014.'"  Opp. at 14.  According to Defendants, the election could be delayed until 2018, 2022, 2026, or indefinitely, as all such dates are technically "after" January 1, 2014.  As Defendants summarize the timing of the election, it can be "in 2014, 2018, <u>or so on</u>."  The will of the voters, as expressed in the 2010 Act, Defendants effectively state, can be ignored by the Council at its discretion.

If any party presents a "tortured reading" of the 2010 Act (Opp. at 6), it is Defendants' "forever-after" interpretation.  No ordinary and sensible voter would countenance such a strained interpretation, and neither should a Court.  This is not a "*reductio ad absurdum* argument" by Plaintiff, as Defendants state (Opp. at 19).  This "or so on" interpretation is precisely what Defendants argue.  The 2013 Act does not stop at 2018, it <u>starts</u> there, without end.  That indefinite extension in the "ordinary legislation" of the 2013 Act contravenes the 2010 Act, which as a Chart amendment nullifies the 2013 Act in this regard.  *Price*.

Defendants' interpretation runs afoul of the well-settled principle that a law must be interpreted to provide it with a meaningful purpose and effect, without rendering it illusory or meaningless.  *See Mountain States Tel & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) ("a statute should be construed under the assumption that Congress intended it to have purpose and meaningful effect"); *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary cannon of construction that a statute should be

interpreted so as not to render one part inoperative"); *Dunn v. Commodity Futures Trading Com'n*, 519 U.S. 465, 472 (1997) ("legislative enactments should not be construed to render their provisions mere surplussage").

Defendants argue that the Council might have been more clear in the 2010 Act about the timing of the election. While they might have added "but before December 31, 2014," or some other such clarification, that does not mean that the language, as passed, can be misconstrued by Defendants to mean any time after January 1, 2014, whenever they want it to be. The only reasonable interpretation of the language, in context, is that the election must take place in 2014.

Three cases cited by Defendants (Opp. at 18) are easy to distinguish. Opp. at 18, citing *Berkely v. D.C. Transit, Inc.*, 950 A.2d 749 (D.C. 2008); *National Broadcasting Co. v. F.C.C.*, 132 F.2d 545 (D.C. App. 1942); *Thomas v. District of Columbia*, 942 A.2d 1154 (19--). In each of these cases, the court simply enforced a statute "after" its effective date, such as a requirement relating to all radio station licenses issued "after June 19, 1934." Obviously, all laws are enforceable "after" their effective dates, including for years to come, like a speed limit law once passed. This point has nothing whatsoever to do with the interpretive issue presented here by the 2010 Act: when must the election take place – in 2014, or at some point forever after?

A much more instructive case is *In re D.M.*, 47 A.3d 539 (D.C. 2012), where the court construed a statute providing that "determinations of whether a child is in need of care or rehabilitation may only be made at or after the dispositional hearing." The court noted that "[r]ead literally, this language in the statute…would appear to authorize the trial court to reexamine the juvenile's need for care or rehabilitation after the delinquency

adjudication" itself.  *Id.* at 547.  But the court declined to adopt this literal interpretation, concluding that "the words 'at or after' were not meant to convey a broad power to redetermine the need for care or rehabilitation and dismiss proceedings after adjudication of delinquency has been properly entered."  *Id*.  The court rejected as "implausible in the extreme" that the Council would have acted to grant such expanded authority.  *Id*. at 549.

Likewise, in this case, the "after January 1, 2014" language, if read literally and expansively, would operate to increase the power of the Council at the expense of the Charter and the electorate.  This would not be tenable.

Where such "rigorous literalism would surely lead to incongruous or absurd results," such an interpretation must be rejected.  *UPS v. D.C. Dep't of Empl. Servs*., 834 A.2d 868 (D.C. 2003) (holding that the phrase "thirteen consecutive weeks immediately preceding the injury" could not be read to *literally* include weeks where the employee was on strike because that would defeat the statutory purpose).  The D.C. Court of Appeals routinely rejects overly literal interpretations of a statute when necessary to effect its purpose.  *See, e.g., id.; 800 Water St., Inc. v. D.C. Alcoholic Beverage Control Board*, 992 A.2d 1272 (D.C. 2010) (lack of a time limit for a party to surrender its liquor license for cancellation did not literally mean that no such limit could exist in order to avoid the "absurd" result of a party avoiding punitive measures by submitting it for cancellation); *D.C. Office of Tax & Revenue v. Sunbelt Bev., LLC*, 64 A.2d 138 (D.C. 2013) (tax code requirement that a person must "file a return" cannot mean literally that one can comply by submitting a blank return); *Russell v. U.S*., 687 A.2d 213 (D.C. 1987) (where a D.C. statute required drivers to display inspection stickers in accordance with a "home jurisdiction's requirements," the court rejected as "absurd" a literal reading that

the requirement does not apply to Virginia cars while in D.C. because Virginia law, by its terms, only applied to cars while driving in Virginia).

Here, the Court is faced with two competing interpretations of the 2010 Act with respect to the timing of the Attorney General election. Only Plaintiff offers a plausible interpretation. Defendants' literal, extreme interpretation is, to use the language of these cases, "absurd."

### C.   All Evidence of Intent Supports the Voters' View

Defendants disingenuously contend that because Plaintiff argues that the 2010 Act is "unambiguous" in requiring an election in 2014, this is an "admission" that extrinsic evidence is "irrelevant." But of course Plaintiff's argument on extrinsic evidence, just like Defendants', is appropriately made. The Court can and should review such evidence, especially where there are two competing interpretations as there are here.

When the extrinsic evidence is reviewed, there is no doubt left as to the proper interpretation of the timing issue. All evidence of intent – without a single exception – supports the voters' view that the election must proceed in 2014.

### 1.   The Voters' Intent

In discussing extrinsic evidence, Defendants bury their discussion of the single most important, and controlling, item of evidence:  what the voters saw on the 2010 ballot when they voted.  The summary stated:  "If voters approve of this amendment…residents of the District of Columbia would begin voting for the Attorney General in 2014." That is crystal clear and the voters said yes by an overwhelming majority of 76%. A Charter Amendment is a two step-process, and the very best

evidence of the intent of the 2010 Act is what the voters expressed when they ratified the amendment and made it law:  that the vote would be <u>in 2014</u>.

At the time in 2010, nobody noticed a disconnect between the Act and the BOE summary because there wasn't one.  The BOE summary reflects exactly what the Act intends, that the election take place in 2014.  In glossing over the voters' ballot as a key item reflecting intent, Defendants show disdain for the voters by calling the voters' ballot "an unfortunate, but understandable, minor discrepancy."  Opp. at 25.  This was no minor discrepancy – it was what the voters were told *by Defendants* and what they *voted for*.

Indeed, the 2010 voters' ballot was drafted, approved, and implemented by *Defendants*, which further confirms both legislative and administrative intent, at the time, that the election would be in 2014.  Defendants were sent and reviewed the BOE summary, and there was a 30-day objection period.  *See* D.C. Code §1-286 (empowering BOE to propose a summary of a voter initiative or referendum and allowing all voters an opportunity to seek a correction in the summary at any point up to 30 days prior to the election).  Defendants dismiss the ballot summary as inconsequential because the full text of the 2010 Act was attached.  This strains credulity. Voters who did read the act would have found nothing to contradict the ballot summary of the act.  Certainly, nothing in the combination of the  ballot and the 2010 Act would lead a voter to believe that they were voting for anything other than an election for Attorney General in 2014.

### 2.      Legislative Intent

The Council's own intent is also clear and uncontradicted.  First, they saw and approved the BOE 2010 ballot summary that the election be in 2014.  Second, the only specific mention of this timing issue came from then Councilmember Mendelson, who in

2009 introduced the bill (B18-0065) and then in early 2010, introduced the relevant amendment that led to the 2010 Act.  Opp. Exs. D & E.  On February 1, 2010, in his then capacity as Chair of the Committee on Public Safety and the Judiciary, the chief architect of the 2010 Act wrote that the amendment as to the timing of the election "clarifies that the first election to be held for the position of Attorney General shall coincide with the election for Mayor in 2014 general election."  Opp. Ex. E at 15 of 15.   That is also crystal clear, and it is the *only* specific expression of legislative intent made at the time.

Defendants gain no ground by pointing to a February 2, 2010 set of proposed competing amendments by Councilmember Wells.   Opp. Ex. F.   His proposed amendments covered numerous material aspects of the legislation, including that the Attorney General remain *appointed* and establishing a new office of "District Attorney," and with respect to the newly proposed District Attorney position, that an election that "shall take place in 2014."  Opp. Ex. H at 10.  The Council did not adopt Councilmember Wells' many proposals, but they in no way, express or implied, "thereby reject[ed] the definitive restriction on when the first [Attorney General] election could be held as well." Opp. at 22.  The Defendants misrepresent the true nature of the Wells proposals.  Even if one reads the date clarification in the Wells proposal as relating to election of the Attorney General, if anything, the proposal simply purports to clarify what the 2010 Act already provided, that the election be in 2014.  Or perhaps the Council rejected Wells' proposals for one of the many other reasons in his extensive rewrite of the entire 2010 Act, such as eliminating the election of Attorney General altogether.  We do not know, and neither side can fairly speculate or drawn inferences about it, as even Defendants are constrained to concede.  Opp. at 23 n. 12.

Meanwhile, Councilmember Mendelson's contemporaneous February 1, 2010 amendment, with the comment that it meant the election would "coincide with the election for Mayor in 2014" <u>did pass</u>.  This is the only direct and specific expression of the intent of the 2010 Act with respect to timing, and it came from the architect and Chair of the relevant Committee.  Defendants cannot dismiss this official interpretive comment as merely the work of "one" Councilmember.

### 3.      Administrative Intent

The BOE is an independent agency charged with implementing and enforcing D.C.'s elections laws.  The D.C. Charter empowers and requires the Board of Elections to submit a Charter initiative to the voters and prepare an accurate summary thereof.

> The District of Columbia Board of Elections and Ethics shall be empowered to propose a short title and summary of the initiative and referendum matter which accurately reflects the intent and meaning of the proposed referendum or initiative. [D.C. Code § 1-286].

By law, the summary and short titled are published in newpapers of general circulation, distributed at public meetings, and served upon the Mayor and Council.  Should any Councilmember or person find the summary or short title to be inaccurate or objectionable, the Charter grants universal standing to any citizen to petition the court for mandamus, "no later than thirty (30) days prior to the election:"

> Any citizen may petition the Superior Court of the District of Columbia no later than thirty (30) days prior to the election at which the initiative or referendum will be held for a writ in the nature of mandamus to correct any inaccurate short title and summary by the District of Columbia Board of Elections and Ethics and to mandate that Board to properly state the summary of the initiative or referendum measure. [D.C. Code §  1-286].

The purpose of the 30 day rule is to prevent just what is occurring in this case, a post-balloting contention that the ballot summary is inaccurate.  Here, no one objected to

the Board of Elections' official summary, because no one disputed that the Amendment meant voting for Attorney General would "begin in 2014."

A BOE summary statement must be impartial, accurate, and reflect the meaning and intent of the amendment.  DCMR 3-1802.2.  The summary is published in the D.C. Register for comment, with an opportunity by the Council or the public to seek correction.  DCMR 3-1802.1,, 1802.4.  Here, the BOE summary was published, with the text of the Act itself following the summary.  Opp. Ex. I.  And BOE has thereafter, to this day, prepared for the 2014 election.  This is not only evidence of administrative intent on this specific point, it creates a presumption of court deference to an agency interpretation. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

### 4.   The Council's Own Lawyer Agrees with Plaintiff

When the Council recently grappled with the issue of the timing of the election, they asked for a legal opinion from one of their own lawyers, John Hoellen, Deputy General Counsel for D.C.  He provided that opinion and he concluded that the election must take place in 2014.  [Dkt. No. 3-1].  This is more powerful evidence that defeats Defendants' "forever-after" theory.  Defendants' response is that the Council ignored the advice of its lawyer, and since six of the eight who did so were on the Council in 2010, the intent of the 2010 Council can be retroactively inferred.  This is a strained argument. The fact of the matter is that the Councilmembers who passed the Delay Provision did so contrary to the advice of their own lawyer, and their action is invalid under the Charter.

### 5.   Even the Attorney General Agreed with Plaintiff

On March 23, 2013, the Attorney General testified to the Council that the "elected Attorney General will, by law, take office in January 2015."  Opening Mem. at Ex. 3.

This is not ambiguous, and it reflects the same view that was held by every single interested person or office as of that point in time: that the election would indeed proceed in 2014, with the elected Attorney General taking office on January 1, 2015.   As the Attorney General said in more precise terms, this would happen "by law."

Obviously, since that time, the Council has taken the opposite action and it is now the Attorney General's duty to defend the Council.   The Attorney General's current arguments in its opposition (and preceding memorandum, Opp. Ex. H) are not, however, tenable.   One particularly glaring error in the memorandum is the contention that the Council has previously "exercised its power to amend or even repeal a popularly-passed initiative or referendum."   Opp. Ex H at 3.   The memo then goes on to cite several voters' initiatives that the Council ignored, such as term limits.   But Title II of the 2010 Act, which contains the timing requirement, amended the Charter itself.   The Council cannot override a Charter provision by ordinary legislation the same way it can ignore a mere voters' initiative (which is only a voter suggestion).

Moreover, in the same memorandum, the Attorney General recommends <u>against</u> the Delay Provision.   He argues that the balance of equities and the public interest strongly counsel against its adoption.   As he stressed:

> …I do not recommend this course of action.  The District's voters by a substantial margin supported the Charter amendment creating an elected Attorney General and did so with the justifiable expectation of voting for one in 2014 who would take office in January 2015 concurrent with the next Mayorial term.  In my view, their expectation should be respected and fulfilled.

*Id*. at 1.   At a minimum, this is a concession that the Attorney General's current interpretation of the statutory language cannot be adopted, as it would "lead to an obvious injustice" – one of the rules of interpretation.  *Dobyns*, 30 A.2d at 159.

**IV.      Plaintiff Suffers Irreparable Harm**

Defendants collapse the "irreparable harm" prong of the preliminary injunction test into the merits, arguing that if they are correct in their interpretation of the 2010 Act, and the Council has the right to delay the election, then there can be no harm.  This essentially concedes the irreparable harm point because if Plaintiff holds the correct interpretation, which he does, then his irreparable harm is established.  If there will be no 2014 election, as required, the harm is irreparable, and cannot be redressed through money or any other means.  The moment will have passed.  Indeed, the irreparable harm has already commenced, as candidates today are being dissuaded from entering the race, raising money, and campaigning.  Starting November 8, candidates will soon miss out on critical time to gather petition signatures, further damaging chances to attract a field of qualified candidates.   And most importantly, the voters are and will be irreparably injured.  They expect to vote in 2014 and absent an injunction, they will be deprived of it.

**V.      The Balance of Equities and the Public Interest Favors the Injunction**

Plaintiff is not seeking to strike down the entirety of the 2010 Act, only the provision that would delay the election until at least 2018.  In his prior memorandum, the Attorney General could not have summarized better how the Court should weigh the "balance of equities" and the "public interest" prongs of the preliminary injunction standard.  The subversion of D.C. democracy is self-evident.  The voters approved the ballot and had, and have, a "justifiable expectation" that the election will proceed in 2014.  As the Attorney General warned them: "the Council should fully consider the consequences of dashing such a justifiable expectation."  Opp. Ex. H at 5.  Unfortunately, eight members of the Council did not heed this advice, nor that of their own lawyer.

And these justifiable voter expectations are of the highest and most fundamental nature that we recognize in our society:  the right to vote.  *Harper v. Virginia Bd. Of Elections*, 383 U.S. 663 (1966); *Wesberry v. Sanders*, 376 U.S. 1 (1964).

Defendants throw out an argument here that the Council's 2013 Act contains restrictions relating to campaign finance and other enabling provisions, which themselves are not yet "final" law until the Congressional passes.  Defendants suggest that in the interim, candidates could simply ignore these campaign finance rules and operate "outside of the realm" of the law.  Opp. at 28-29 & n.15.  They say that the timing of the election must be moved to 2018, or otherwise this "dire" circumstance could ensue.

This is a farcical argument.  All that plaintiff demands, and all that this Court need declare, is that the timing of the election proceed in 2014, as long-planned.  BOE has followed all provisions of the 2010 Act and 2013 Act in all of its enabling respects.  It has even proceeded to tee up the 2014 election, albeit with an asterisk.  Any candidate for the office must go to BOE and sign a declaration, pick up petition forms, and proceed in accordance with all applicable campaign finance rules.  The campaign finance rules are not in a state of suspension until the Congressional review period passes, such that candidates can temporarily operate "outside the realm" of law and freely conduct "corrupt" campaigns.  *Id*. at 29 n.15.  This is a preposterous supposition.

In any event, that issue is not before this Court.  If a candidate really did conduct a corrupt campaign during this interim period until the Congressional review period passes, surely BOE and other agencies would take corrective or punitive action, and if the candidate presented such a defense in court – that "I had a temporary pass to operate outside the realm of law" during the Congressional review period – surely such a defense

would be rejected as frivolous.  Such an argument is no less frivolous in the guise of the argument made by Defendants in their opposition.

Moreover, if the Court strikes down the Delay Provision, the Council also will be free to find ways to ensure that the campaign finance requirements apply appropriately. The Council could simply enact those provisions from the 2013 act as emergency legislation.  The Council routinely passes emergency acts to temporarily fill gaps in the law caused by the congressional layover period, and surely would have no trouble doing so in response to a court order here.   Indeed, the election and campaign finance provisions had already been in effect on an emergency basis from July 31 to October 29. Election Code Conforming Emergency Amendment Act of 2013, A. 20-143, 60 D.C. Reg. 11799 (Aug. 16, 2013).  Furthermore, the 2010 legislation amended the Elections Act, which governs elections procedure, to clarify explicitly that it applies to the Attorney General. D.C. Code § 1-1001.01. So, there is no question as to how election and campaign finance law would apply to Attorney General candidates.

The fact is that Defendants advance this non-argument because they can say nothing about the "balance of equities" and the "public interest" here, as these factors so overwhelmingly weigh in favor of granting the injunction.   The right to vote is fundamental and its deprivation is the most egregious in our system of government.

Defendants' final argument on the point is their suggestion that their current interests are "coterminous" with the public's interest.  Defendants suggest that they know better than 76% of the voters.  But the voters are the "public" and their will is loud and clear:  hold the election in 2014.

**Conclusion**

This brief has not canvassed the underlying reasons why the public demanded an elected Attorney General, which reasons are well referenced in the legislative memoranda attached to the parties' filings:   the public wants an independently elected attorney general to operate as an free-standing office in the enforcement of the laws and regulations of D.C., including as an independent check and balance on the Council and Mayor themselves.   This is part of the public's outcry against corruption and ethical lapses in our City government.   The voters want a neutral legal watchdog, answerable directly to the people.   The peoples' expectation for a 2014 election is justifiable.

For whatever reason and however motivated, the Council wants to override the will of the voters.   There could not be a more glaring affront to the "public interest."   The Council would be wise to reverse course and allow the election to proceed in 2014, as everyone around them advised.   But short of such a reversal, the Delay Provision must be struck down as illegal.   An injunction from this Court is the only means left to the voters to enforce their clear will and interest.

Date:  November 4, 2010

Respectfully submitted,

REED SMITH LLP

By: /s/Gary S. Thompson
Gary S. Thompson (#435315)
Marc S. Kaufman (#440124)
1301 K St., N.W., Suite 1100
Washington, D.C. 20005
Tel. (202) 414-9418
Fax (202) 414-9299
Email:  gthompson@reedsmith.com

*Counsel for Plaintiff*
*Paul Zukerberg*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2013, I filed and served the foregoing on ECF and by emailing, and mailing, a copy to Matthew Blecher, Assistant Attorney General for the District of Columbia, at 441 4th St. N.W., Suite 600S, Washington, D.C. 20001.

/s/Gary S. Thompson
Gary S. Thompson