UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL ZUKERBERG,<br><br>    Plaintiff,<br><br>    v.<br><br>DISTRICT OF COLUMBIA<br>BOARD OF ELECTIONS AND ETHICS<br><br>    and<br><br>COUNCIL OF THE DISTRICT<br>OF COLUMBIA,<br><br>    Defendants. | Civil Action No. 13-1557 (JEB) |

## MEMORANDUM OPINION

When District of Columbia voters went to the polls on November 2, 2010, they encountered a litany of typical state- and local-government fare: elections for Mayor, City Council, and Delegate to the U.S. House of Representatives, among other positions. In the rightmost column of the one-page ballot, though, voters found a three-paragraph summary of "Proposed Charter Amendment IV: The Elected Attorney General Amendment." See District of Columbia Board of Elections, November 2, 2010 General Election Sample Ballot, http://www.dcboee.org/popup.asp?url=/pdf_files/nr_597.pdf. This 2010 Charter Amendment proposed to establish the District's Attorney General as an elected, rather than an appointed, office. The question printed on the ballot said that D.C. voters "would begin voting for Attorney General in 2014." See id. The language of the underlying statute the voters were being asked to approve – not included on the ballot – was more ambiguous: the text stated that an election for Attorney General would be held "after January 1, 2014." Presented with only the unequivocal

1

language on the actual ballot, an overwhelming majority – 76 percent of those who cast a ballot – voted "Yes."

Some three years later, and just eight months before the first scheduled primary election for Attorney General, the City Council voted to postpone the election until at least 2018. See Opp., Exh. A (Elected Attorney General Implementation and Legal Services Establishment Amendment Act of 2013) at 10. The Mayor declined to veto that law, and on October 24, 2013, it went to Congress for that body's mandatory 30-legislative-day review of ordinary D.C. legislation. This is where it remains today.

In response to this 2013 Act, Plaintiff Paul Zukerberg brought this suit alleging that, even prior to its formal passage, the Act infringes his rights as a voter and as a potential candidate for Attorney General under the First and Fifth Amendments and the newly amended D.C. Charter. Soon thereafter, he moved for a preliminary injunction, hoping to prevent the District from enforcing the 2013 Act while candidates begin to collect the signatures and raise the money necessary to run in the scheduled 2014 primary. While Zukerberg raises an interesting challenge, the Court has no power to rule on that question today, as none of his claims is ripe for review. His Motion for Preliminary Injunction, consequently, must be denied without prejudice.

I. **Background**

Most of the facts in this case are not in dispute. To begin with, in the District, ordinary legislation takes effect only after three prerequisites are met: First, the City Council must pass the legislation; second, the Mayor must sign it (or, as he did in this case, fail to veto it); and, third, it must survive Congress's mandatory 30-legislative-day review. See D.C. Code § 1-206.02(c)(1). If Congress does not pass a joint resolution disapproving of the legislation within that time limit, the Council's bill becomes law. See id. The Mayor declined to veto the 2013

Act, effectively approving it on October 24, 2013, but, due to the peculiarities of the 113th Congress's schedule, the 30-day review period will not come to an end until sometime after December 20, see Opp., Exh. C (Legislative Information Management System printout), and perhaps as late as the first week of January 2014. See Opp. at 4.

In the meantime, Plaintiff has challenged the 2013 Act on the ground that it conflicts with the 2010 Amendment and thus violates his rights under the First and Fifth Amendments to the U.S. Constitution, as well as the D.C. Charter. See Am. Compl., ¶ 15. In his Motion for Preliminary Injunction, he argues that D.C. voters and potential candidates for Attorney General – himself included, see Am. Compl., ¶¶ 2, 10 – will suffer irreparable harm if the Court does not take immediate action.

Based on its interpretation of current law – that is, the 2010 Charter Amendment, not the pending 2013 Act – the D.C. Board of Elections has scheduled the Attorney General election for 2014. Although Plaintiff filed his Complaint and Motion for Preliminary Injunction based on his fear that the District would remove the Attorney General position from the 2014 ballot as early as October 22, 2013, see Mot. at 5, that has not come to pass. Instead, pursuant to its authority, the Board made official nominating petitions available on November 8, 2013 – 144 days prior to the April 1, 2014, primary for Attorney General that it had scheduled. See Mot. at 12. To gain access to the ballot, a candidate for Attorney General must collect 2,000 signatures by January 2, 2014. See id. While Congress is considering the law, Plaintiff argues, the uncertainty surrounding the 2013 Act and the scheduled election has created and will continue to create a "chilling effect," discouraging potential candidates from filing to run and spending money to collect the necessary signatures and dissuading potential donors from contributing. See id. at 11;

Reply at 7-8 ("With the 2013 Act hanging over the 2014 election like the sword of Damocles, there is a substantial disincentive for any candidate to declare, raise funds, and engage voters.").

Defendants respond that the plain language of the 2010 Amendment allows the Council to act as it has, but that, in any case, the controversy is not ripe. Opp. at 3. Because Congress has not yet approved the 2013 Act, they argue, there is nothing for the Court to enjoin. Id. Plaintiff, furthermore, does not dispute that the Council and the Board of Elections have continued to act as though the election will go forward. Not only did the BOE distribute petitions on November 8, but its website also currently lists Attorney General as one of the positions that will be contested in the April 1, 2014, primary. See Reply at 7. On the other hand, the BOE has placed "asterisks" next to the position on its website and includes a note stating that the election may not proceed. See id. at 8.

The parties submitted preliminary-injunction briefs on an expedited timetable, and the Court held a hearing on the Motion on November 7, 2013.

## II.   Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. NRDC, Inc., 555 U.S. 7, 9 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Id. at 20.

Before the Court may consider these factors, it must first determine whether it has jurisdiction to hear the case because "Article III jurisdiction is always an antecedent question." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998). A court may not,

therefore, "resolve contested questions of law when its jurisdiction is in doubt." Id. at 101. Alternatively, perhaps, as one court in this Circuit has observed, the Court could conclude that Article III jurisdiction is "[t]he first component of the likelihood of success on the merits prong" of the preliminary-injunction analysis. Barton v. District of Columbia, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001) (citing Steel Co., 523 U.S. at 101).

It is the plaintiff who bears the burden of proving that the court has subject-matter jurisdiction to hear his claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, although the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged,'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted), "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving [jurisdictional issues]' than [merits questions]." Grand Lodge, 185 F. Supp. 2d at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

Additionally, a court "may consider materials outside the pleadings in deciding [questions] of jurisdiction. . . ." Jerome Stevens Pharms., Inc. v. F.D.A., 402 F.3d 1249, 1253 (D.C. Cir. 2005); cf. also Venetian Casino Resort, LLC. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings"); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.     Analysis**

Defendants contend that this Court does not have jurisdiction to decide Plaintiff's claims because the law Zukerberg seeks to invalidate is not final, and thus it may never take effect at all. See Opp. at 7-8. In short, they argue, the matter is unripe. The Court agrees.

   A. Ripeness

At its foundation, ripeness is about whether a federal court "can or should decide a case." Am. Petroleum Inst. v. E.P.A., 683 F.3d 382, 386 (D.C. Cir. 2012). Article III does not allow a litigant to pursue a cause of action to recover for an injury that is not "certainly impending." Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (citing Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996)); Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur.") (citation omitted); see also Full Value Advisors, LLC v. S.E.C., 633 F.3d 1101, 1107 (D.C. Cir. 2011) ("A claim is not ripe where the 'possibility that further consideration will actually occur before [implementation] is not theoretical, but real.'") (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 735 (1998)).

The doctrine's purpose is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . until [a] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties," Abbott Laboratories v. Gardner, 387 U.S. 136, 148–49 (1967), and thus to "ensure[] that Article III courts make decisions only when they have to, and then, only once." Am. Petroleum Inst., 683 F.3d at 387 (citing Devia v. N.R.C., 492 F.3d 421, 424 (D.C. Cir. 2007)); Alcoa Power, 643 F.3d at 967 (D.C. Cir. 2011) (noting "usually unspoken underlying rationale . . . [that] a claim may be unripe where if we do not decide the claim now, we may never need to").

The constitutional provenance of that principle is well understood. As Justice Frankfurter put it:

> [Where an order] does not grant or withhold any authority, privilege, or license . . . the denial of judicial review . . . does not derive from a regard for the special functions of [coordinate branches]. Judicial abstention here is merely an application of the traditional criteria for bringing judicial action into play. Partly these have been written into Article 3 of the Constitution by what is implied from the grant of "judicial power" to determine "Cases" and "Controversies." Partly they are an aspect of the procedural philosophy pertaining to the federal courts whereby, ever since the first Judiciary Act, Congress has been loathe to authorize review of interim steps in a proceeding.

Rochester Telephone Corp. v. United States, 307 U.S. 125, 130-131 (1939) (citations and internal quotation marks omitted).

In assessing finality and concreteness in the context of this dispute, then, the Court must decide whether the 2013 Act, which would effectively cancel the 2014 Attorney General election, is final enough for the Court to consider Plaintiff's challenge – that is, whether action pursuant to the Act is "certainly impending." To state the question is to supply its answer, for it is uncontroversial that a law that has not yet been passed, is not yet binding, and may never "have its effects felt" at all cannot be considered final. The case law supports that commonsense notion.

For example, in Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103 (1948), the Supreme Court considered a challenge to a decision of a regulatory board that required presidential approval before it could take effect. Writing for the majority, Justice Jackson observed that "[u]ntil the decision of the Board has Presidential approval, it grants no privilege and denies no right. It can give nothing and can take nothing away from the applicant or a competitor." Id. at 112. Such an interim order, he concluded, is "not reviewable." Id. at

7

112-13. The 2013 Act, similarly, has no legal effect – it denies no right, and it takes nothing away from the voters or potential candidates – until the congressional review period has passed. See D.C. Code § 1-206.02(c)(1). As a result, it cannot be reviewed. See also Rochester Telephone Corp., 307 U.S. at 130-131 ("[T]he order sought to be reviewed . . . only affects [complainant's] rights adversely on the contingency of future administrative action. In view of traditional conceptions of federal judicial power, resort to the courts in these situations is either premature or wholly beyond their province.").

The D.C. Circuit recently had occasion to assess ripeness under somewhat similar circumstances – albeit in the context of prudential ripeness. In American Petroleum Institute, the plaintiff, a trade association, sought judicial review of a "final rule" issued by the EPA in 2008 deregulating "hazardous secondary materials." See 683 F.3d at 384–86. Shortly after the parties had fully briefed the merits of the case, though, the EPA published a notice of proposed rulemaking that would have altered the rule in a way to make the case "go[] away without the need for judicial review." Id. at 388. The court concluded that the case was not ripe because, although the 2008 regulation was a "final rule," the EPA's position on the policy being challenged was tentative. See id. Central to the analysis – and of particular interest to this Court – was the fact that an impending decision by the agency, in that case a proposed EPA rule, might obviate the need for judicial review. See id. ("In light of the July 2011 proposed rule, though, '[i]f we do not decide [the issue] now, we may never need to.'") (quoting Nat'l Treasury Emps. Union, 101 F.3d at 1431) (alterations in original).

This case is a significant step removed from American Petroleum Institute. That is, there are even more reasons to consider this case unripe. The Court here has before it a challenge to a statute that must go through further procedures before it can have any concrete, legally binding

8

effect. Indeed, although the District has taken the first two steps toward amending the Code – the Council passed the 2013 Act, and the Mayor did not veto it – further action, in this case by Congress, could nullify it. In contrast, in American Petroleum Institute, the Court had before it a final regulation, albeit one that the agency was considering altering. Nonetheless, both the American Petroleum Institute case and this one represent controversies that may shortly become moot – either through ameliorative rulemaking or a veto by Congress. Like the American Petroleum Institute panel, then, if this Court declines to review the 2013 Act at this time, it "may never need to." See Am. Petr. Inst., 683 F.3d at 387.

The American Petroleum Institute court also emphasized that the rulemaking process would provide the plaintiff with "a chance to convince the EPA to change its mind." Id. at 388. Given that the court could not know for sure what form the final rule would take, or even whether it would change at all, the court determined that it would be best to withhold review until the matter was settled. Id. Zukerberg, similarly, has had – and, indeed, still has – ample time to try to convince Congress to veto the law. Because "[t]he interest in postponing review is powerful when the [legal] position is tentative," Ciba–Geigy Corp. v. E.P.A., 801 F.2d 430, 436 (D.C. Cir. 1986), the Court concludes that the 2013 Act will not be "sufficiently final" to satisfy the finality and concreteness aspects of the ripeness inquiry until Congress has had the chance to pass judgment.

B. Plaintiff's Counter-Arguments

Plaintiff marshals a number of arguments in an attempt to sidestep this obvious bar. First, he points out that courts have on occasion permitted pre-enforcement challenges to statutes and regulations. See Reply at 8. For example, in Abbott Laboratories, 387 U.S. 136 (1967), the seminal opinion cited by both sides in this case, the petitioner drug manufacturers sought judicial

9

review of a federal regulation requiring specific changes to existing labeling requirements. Id. at 138-39. The regulation at issue had taken effect but had yet to be enforced by the respondent federal agency. Id. at 139. Notwithstanding the lack of enforcement, the Court determined that the petitioners' challenge was ripe for review, relying principally on the fact that the <u>existence</u> of the regulation – even before it had been enforced – placed the petitioners in the untenable position of choosing between complying with the law (and incurring economic hardship) or refusing to comply at the risk of future enforcement. Id. at 152. Here, by contrast, the law in question has not actually been promulgated; instead, it still awaits congressional action. So it is not an issue of enforcement, but rather of existence, that prevents ripeness here.

In addition, because the <u>Abbott Laboratories</u> labeling law was already in effect, the hardship on the petitioners was present and real, and "the impact of the regulations . . . [was] sufficiently direct and immediate as to render the issue appropriate for judicial review" prior to enforcement. Id. Zukerberg, conversely, faces no similar dilemma. The 2013 Act does not impose any concrete hardship on him because it is not the law. It is, after all, nothing but proposed legislation at this point. Whereas the petitioners in <u>Abbott Laboratories</u> were faced with the <u>immediate</u> choice of whether to comply with the challenged regulation or risk swift and hefty punishment, the 2013 Act has not forced Plaintiff to make any hard decisions today. This is because the BOE continues to enforce its interpretation of the 2010 Amendment – in other words, it continues to act as though there will be an Attorney General election in 2014. In these circumstances, Plaintiff may continue to collect petitions and raise funds. The threat to his interests is anything but immediate.

Plaintiff next argues that congressional review of D.C. statutes amounts to a "rubber stamp," that the 2013 Act will "inevitably" become law, and that the controversy must thus be

10

considered ripe now.  See Reply at 7.  As evidence for this proposition, Plaintiff notes that Congress rarely steps in to invalidate a D.C. statute, and he suggests that the BOE treated the Mayor's review – not Congress's – as "the relevant moment" of passage.  Id.

The Court sees two compelling responses to Plaintiff's argument.  First, it is important to note that although the BOE paid lip service to the idea that the office of Attorney General was included on the list of electable positions "pending the Mayor's review" of the 2013 Act, see D.C. Board of Elections, Candidate Guide to Ballot Access, http://www.dcboee.org/candidate_info/general_info/, in practice it has treated congressional review as the *sine qua non*.  In fact, although the Mayor approved the bill and sent it to Congress on October 24, BOE has not begun to enforce the Act, and all available evidence suggests that the agency will not enforce it until it becomes binding law – that is, until Congress's opportunity to act passes.

Second, and related, just because the 2013 Act's passage is likely or even "inevitable" does not mean it is ripe for review.  Hugely popular bipartisan legislation that has just been introduced, for example, or a bill that Congress has passed and the President has vowed to sign is not law – yet.  The full legislative process must still be completed.  Plaintiff has offered no examples – and the Court has found none – of any case in which a federal court has allowed a pre-passage challenge to a statute on the grounds that it is likely – even inevitable – that it will pass.  See Felix Frankfurter, A Note on Advisory Opinions, 37 Harv. L. Rev. 1002, 1002-04 (1924) (Despite the fact "that opinions of the Supreme Court in advance of legislation would be 'constructive,'" they remain impermissible advisory opinions.); Note, Advisory Opinions and the Influence of the Supreme Court over American Policymaking, 124 Harv. L. Rev. 2064, 2064 (2011) ("[T]he Supreme Court will not consider whether potential legislative or executive action

11

violates the Constitution when such action is proposed . . . . So, if a legislative coalition wishes to enact a law that might plausibly be struck down . . . it must form its own estimation of whether the proposal is constitutional but cannot know for certain how the Court will ultimately view the law.") (citations omitted). That Congress rarely disapproves of D.C. statutes, then, cannot render the present controversy ripe for review.

Perhaps sensing that he has an uphill climb, Plaintiff argues in his Sur-Sur-Reply that the language of the D.C. Home Rule Act suggests that a D.C. bill becomes law after the Council passes it and the Mayor approves it. See Supp. Br. at 2. Indeed, the Charter does state that an act adopted by the Council and approved by the Mayor "shall become law," D.C. Code § 1-204.04(e) (emphasis added), and that if Congress passes a joint resolution of disapproval, that resolution is "deemed to have repealed such act." § 1-206.02(c)(1) (emphasis added). This clever observation, though, amounts to nothing more than semantics. Although the Home Rule Act refers to the piece of paper approved by the Mayor as "law" and Congress's intervention as "repeal," that "law" cannot be enforced until the congressional review period is up. See id. Until then, the BOE will presumably continue to allow candidates to register and pick up petitions. (And if it does not, Plaintiff may challenge that decision.) A law that cannot be enforced – even though it may be "repealed" in name – cannot be final for purposes of ripeness review.

C. Unavailability of Relief

The Plaintiff's prayer for relief further highlights his ripeness problem. In his Complaint, he requests that the Court "prohibit[] the D.C. Council from taking any action to overturn, frustrate or undermine the [2010] Charter Amendment." Compl. at 7. The Court sees two ways to read this, and both betray the present jurisdictional infirmity of Plaintiff's claim. If the

12

Complaint is taken to ask the Court to prevent the Council from considering a law that would postpone the 2014 Attorney General election, then Plaintiff has proposed a non-starter for the obvious reason that the Council has already done so and the Court thus is not in a position to grant the relief requested. (The Court also notes that the District's Speech and Debate Clause would prevent a court from telling the Council it cannot even consider a law. See Chang v. United States, 512 F. Supp. 2d 62, 64-65 (D.D.C. 2007)). If, instead, Plaintiff seeks to ask the Court to prospectively prevent the Council from enforcing the 2013 Act, then he has managed only to underscore the fact that the Council cannot presently enforce the Act, for the simple reason that the Act is not yet law. Either way, the Court can afford no relief to an unripe claim.

Plaintiff also asks the Court to "prohiabit[] the Board of Elections from removing the Office of Elected Attorney General from the 2014 ballot." Compl. at 7. This request, too, makes manifest the ripeness difficulty he faces. As the Court has made clear, the present controversy is not yet ripe in part because the Board of Elections has not removed the Attorney General position from the 2014 ballot, nor has it indicated that it intends or has the authority to do so until the 2013 Act is passed. One principle underlying the ripeness doctrine is that courts cannot simply wade into any legal conflict to offer advisory opinions on what the government can and cannot do until there is a concrete action whose legality may be addressed. See, e.g., Richard H. Fallon, Jr., Daniel J. Meltzer, & David L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 81 (5th ed. 2003) ("advice to a co-equal branch of government prior to the other branch's contemplated action" would render an impermissible advisory opinion) (internal quotation marks and alterations omitted); Charles Alan Wright *et al.*, 13 Federal Practice & Procedure § 3529.1 (3d ed. 1998) ("courts have no general veto or supervisory power over Congress").

13

Plaintiff contends, finally, that postponing judicial review will impose a hardship on him because he must immediately begin considering the possibility that there will be no election in 2014. See Mot. at 10-11. Yet hardship alone cannot transform an unripe case into a ripe one. If this were so, the category of ripe cases would grow dramatically. In other words, if the 2013 Act were ripe merely because some candidates were dissuaded from running for Attorney General on the chance – even the large chance – that the election would be postponed, then almost any proposed law that had the potential to affect private rights and responsibilities could face a similar challenge. The Court is reminded of the example, discussed at some length at oral argument, of the car dealer worried about the effect of a proposed bill that would raise taxes on car sales. If the legislature has not yet passed the law, no one would suggest that the dealer could bring a court challenge based on the fact that such a tax might prospectively alter his business model. See, e.g., Clapper v. Amnesty Int'l, 133 S. Ct. 1138, 1151 (2013) ("[R]espondents cannot manufacture [Article III jurisdiction] merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). That the 2013 Act has a potential impact on Zukerberg's actions before it becomes binding, then, cannot independently support judicial review.

IV. **Conclusion**

At the end of the day, the Court offers no opinion on the legality of the 2013 Act. If Plaintiff is displeased by the law, he may certainly renew his Motion for Preliminary Injunction once the Act becomes binding. All the Court holds here is that he has no basis on which to proceed today.

That said, the parties are reminded that even if the case ultimately becomes ripe for review, that does not necessarily mean that this Court is the proper forum for adjudication. As

14

discussed at the hearing, Plaintiff will not succeed in this forum unless he is able to articulate a federal constitutional claim.  The parties devoted almost no attention to this question in their briefing here, but the Court will have to grapple with it in a potential next round.  Should Plaintiff decide to file a renewed Motion for Preliminary Injunction once Congress's 30-day review period has passed, the Court trusts he will shore up any insufficiencies in his pleadings in this regard.  Of course, if he has doubts about the legitimacy of such claims, he may dismiss this case and re-file in Superior Court, omitting his federal-law claims to avoid removal.

The Court, therefore, will issue a contemporaneous Order denying Plaintiff's Motion for Preliminary Injunction on the ground that the controversy is not yet ripe for review.

/s/ James E. Boasberg
JAMES E.  BOASBERG
United States District Judge

Date:  November 15, 2013